UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MICHAEL AZIZ ZARIF SHABAZZ,

                              Plaintiff,
                                                        9:12-CV-1372
v.                                                      (NAM/TWD)

T. HOWARD, et al.

                              Defendants.
_____

APPEARANCES:                                   OF COUNSEL:

MICHAEL AZIZ ZARIF SHABAZZ
72-B-0089
Plaintiff pro se
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953


HON. ERIC T. SCHNEIDERMAN                RACHEL M. KISH, ESQ.
Attorney General for the State of New York     Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge


## ORDER AND REPORT-RECOMMENDATION

This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Norman A. Mordue,

Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

Plaintiff Michael Aziz Zarif Shabazz has asserted claims for excessive force and deliberate

indifference to his serious medical needs in violation of his Eighth Amendment rights.[1] *(See generally* Dkt. No. 1.)  Defendant Candy[2] Atkinson, R.N. ("Atkinson") has moved pursuant to Federal Rule of Civil Procedure 56 for partial summary judgment on Plaintiff's Eighth Amendment claim against her for deliberate indifference to his serious medical needs.  (Dkt. No. 48.)  Plaintiff has failed to oppose the motion despite having been granted an extension of time to August 17, 2015, within which to do so.[3]  (Dkt. No. 55.)   For reasons explained below, I recommend that Defendant Atkinson be granted summary judgment.

## I.      FACTUAL BACKGROUND

Plaintiff is an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at Upstate Correctional Facility ("Upstate") in Malone, New York.  (Dkt. No. 1 at ¶ 5.)  Defendant Atkinson is a Registered Nurse ("RN") who was employed by DOCCS at Upstate throughout the relevant time period.  (Dkt. No. 48-4 at ¶ 1.)

Plaintiff has alleged that on August 7, 2009, Defendants Rhondo, Burdett, and Howard used excessive force against him, breaking his left leg and causing other injuries.[4]  (Dkt. No. 1 at

---

[1]  The two Eighth Amendment claims are the only claims that survived the initial review undertaken pursuant to 28 U.S.C. § 1015(e)(2)(B) and § 1915A.  (*See* Dkt. No. 11.)

[2]  "Candy" is spelled incorrectly as "Candi" in Plaintiff's Complaint.  (Dkt. No. 1 at 1.)

[3]  Although Defendant Atkinson filed an outdated and inadequate notice form in her attempt to comply with N.D.N.Y. L.R. 7.1(a)(3) and L.R. 56.2 (Dkt. No. 48-1 at 1), the Clerk's Office provided Plaintiff with the current form advising him of the consequences of his failure to respond to her motion for partial summary judgment on June 1, 2015.  (Dkt. No. 50 at 2.)

[4]  Neither the excessive force claim asserted against Defendants T. Howard, R. Rhondo, and B. Burdett, nor the deliberate indifference to Plaintiff's serious medical needs claim against Defendants Dr. D'Acevedo, whose name is spelled incorrectly as "Acevedo" in Plaintiff's Complaint (Dkt. No. 1 at 1), and Dr. Roe, is at issue in the present motion.

¶¶ 15-28.) Following this alleged incident, Plaintiff underwent surgery during which two metal plates and fifteen screws were inserted into the broken leg. *Id.* at ¶ 18. After surgery, the facility medical staff provided Plaintiff with the use of crutches, an "out of cell" wheelchair, and a splint on his left ankle. (Dkt. No. 49.)

On December 23, 2009, facility physician, Defendant Dr. Mario D'Acevedo ("Dr. D'Acevedo"), ordered discontinuance of Plaintiff's crutches, wheelchair, and splint. (Dkt. No. 49.) According to Defendant Atkinson, Plaintiff's Ambulatory Health Record ("AHR"), dated December 23, 2009, as written and signed by Dr. D'Acevedo, reads in pertinent part:

> Subjective: PCP [Primary Care Physician] to evaluate need for crutches, out of cell w/c [wheelchair], and check on splint and/or cast.

> Objective: Refused ortho [Orthopedist] f/u [follow-up] on 9/11/09 and PT [Physical Therapist] per [Orthopedist] recommend on 9/11/09 D/C/ [discontinue] crutches and [discontinue] splint L [left] leg

> Assessment: IM [inmate] walks in cell [without] crutches; Refusal PT [and] Ortho

> Provider Orders: [Discontinue] crutches, [Discontinue] splint, [Discontinue] wheelchair out of cell.

(Dkt. Nos. 48-4 at ¶ 11; 49.) Defendant Atkinson executed Dr. D'Acevedo's orders and made entries on the AHR noting that Plaintiff's splint had been forwarded to the facility arsenal to be destroyed, and that security was advised that Plaintiff's crutches had been retrieved. (Dkt. Nos. 48-4 at ¶¶ 9-10; 49.)

In his Complaint, Plaintiff has alleged that Atkinson conspired with Defendant Drs. Jerry

"Roe"[5] ("Dr. Roe") and D'Acevedo to take away his crutches. (Dkt. No. 1 at ¶ 50.) According to Plaintiff, on one occasion during the first six months of 2010, he hopped to his cell door on his right leg.[6] *Id*. at ¶ 58.) Atkinson saw him hopping to the cell door without his crutches and told Dr. Roe that Plaintiff was walking and to take away his crutches. *Id*. at ¶¶ 58-59.

Plaintiff claims that as a result of having his crutches taken away, he fell on several occasions, exacerbating his pain and the injury to his leg. *Id*. at ¶ 53. Plaintiff also claims that as a result of his crutches being taken away, the calcium forming in the calf of his left leg broke and drained down to his left ankle, and that as a result of the metal plate and screws inserted in his left leg, he has ongoing pain and suffers by putting pressure on his left foot and leg, forcing him to hop around on his right leg. *Id*. at ¶¶ 56-57. Plaintiff asserted additional claims against Atkinson and Drs. D'Acevedo and Roe at his deposition, namely, failure to provide adequate pain medication and failure to recommend or perform surgery to remove the metal plate from his leg. (Dkt. No. 48-6 at 28.)

Atkinson has explained in her Affidavit that as an RN, her authority with regard to Plaintiff's medical treatment was limited. (*See generally* Dkt. No. 48-4.) According to Atkinson, as an RN at Upstate, her duties generally include, among other things: "(1) Conducting physical examinations of inmates when requested and/or required[;] (2) Maintaining medical records documenting subjective complaints and objective medical findings; (3) Providing medical services, triage and over the counter medication to inmates, as warranted or prescribed

---

[5] Plaintiff does not know Dr. Roe's last name. (Dkt. No. 48-6 at 28.)

[6] Given the December 23, 2009, physician's order discontinuing the crutches at that time, Plaintiff appears to be mistaken as to when Atkinson saw him hop to the front of his cell. (Dkt. No. 49.)

by physicians[;] and (4) Facilitating the inmates' treatment as directed by the facility physicians." *Id*. at ¶ 2.

Atkinson has no personal authority to discontinue an inmate's facility-issued crutches, prescribe pain medication, or order or authorize an inmate to be seen by an outside specialist or surgeon. *Id*. at ¶ 5. Those tasks can only be completed by a DOCCS physician, and as an RN, Atkinson's only role would be to facilitate the physician's order. *Id*. at ¶ 6. For example, when a physician orders that an inmate's use of medical equipment be discontinued, Atkinson's only role as an RN would be to record the order and possibly make arrangements with security staff to remove the equipment. *Id*. When a physician prescribes pain medication for an inmate, Atkinson's only role, as an RN, is to deliver the medication to the inmate. *Id*. When a physician refers an inmate for treatment by an outside medical specialist, as an RN, Atkinson's only role would be to record the order and facilitate the administrative steps necessary to act on the physician's referral. *Id*.

## II.    APPLICABLE LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id*. at 273 (citations omitted). The nonmoving party must do more than "rest upon the mere allegations . . . of [the plaintiff's]

pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

When a plaintiff fails to respond to a defendant's motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, the Court must (1) determine what material facts, if any, are undisputed in the record; and (2) assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the defendants. *See Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001); L.R. 7.1(b)(3).

Where a plaintiff has failed to properly respond to a defendant's Statement of Material Facts (its "Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se*, has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *See* L.R. 7.1(a)(3); *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *Champion*, 76 F.3d at 486.

## III.    ANALYSIS

Atkinson claims she is entitled to summary judgment on the ground that she was not personally involved in the claimed deliberate indifference to Plaintiff's serious medical needs. (Dkt. No. 48-3 at 7-8.)  The Eighth Amendment, made applicable to the states through the Fourteenth Amendment, prohibits "cruel and unusual punishments."  U.S. Const. amend. VIII. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment.  *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976).  Punishment is cruel and unusual if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "'the evolving standards of decency that mark the progress of a maturing society.'"  *Id*. at 102 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). Thus, the Eighth Amendment imposes on prison officials the duty to "provide humane conditions of confinement" for prisoners.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care.  *Id*. (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

To state an Eighth Amendment claim for denial of adequate medical care, an inmate must show that prison officials acted with deliberate indifference to his serious medical needs.  *Estelle*, 429 U.S. at 104.  The inmate must demonstrate (1) a serious medical condition and (2) deliberate indifference.  *Farmer*, 511 U.S. at 834-35; *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious.  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may

result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citations omitted). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Id.* at 702-03.

The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter*, 501 U.S. 294, 301-03 (1991); *Hathaway*, 37 F.3d at 66. A plaintiff must demonstrate that a defendant acted with reckless disregard to a known risk of substantial harm. *Farmer*, 511 U.S. at 836. Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Id.* at 837; *Chance*, 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835.

"[D]eliberate indifference is more substantial than mere disagreement over a course of treatment, negligence or even medical malpractice." *Santana v. Watson*, No. 13 Civ. 1549 (SAS), 2014 WL 1803308, at * 5, 2014 U.S. Dist. LEXIS 62628, at * 24 (S.D.N.Y. May 6, 2014)[7] (dismissing claim on summary judgment where, "[a]t most, the[ ] facts show that [the

---

[7] The Court will provide Plaintiff with a copy of the unpublished decision in accordance with the Second Circuit decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

nurse] knew [plaintiff] had a prescription for a CPAP machine and failed to follow up on his CPAP request in a timely manner," but "[t]here [was] no indication that she deliberately denied access . . . , or that she knew that the failure to provide a CPAP machine posed an excessive risk to [plaintiff's] health or safety.").

The Court finds that Plaintiff's broken leg, which required surgery involving the insertion of two metal plates and fifteen screws, constituted an injury that a "reasonable doctor would find important and worthy of treatment," *Chance*, 143 F.3d at 702-03, and thus falls within the definition of a "serious medical condition." However, the evidence in the summary judgment record establishes that Atkinson did not act with deliberate indifference. Atkinson, an RN, was not authorized to make medical decisions concerning Plaintiff's course of treatment, including discontinuing his facility-issued crutches, prescribing pain medication, or ordering him to see a surgeon. (Dkt. No. 48-4 at ¶ 5.) The evidence reveals that Atkinson did nothing more than follow through on Dr. D'Acevedo's orders with regard to discontinuing Plaintiff's use of crutches, wheelchair, and a splint by forwarding the splint to the facility arsenal for destruction and advising security that Plaintiff's crutches had been retrieved. *Id*. at ¶¶ 9-10; Dkt. No. 49.

In light of the evidence establishing Atkinson's limited authority and limited role in Plaintiff's medical care, I find that no reasonable factfinder could conclude that she acted with deliberate indifference in depriving him of adequate medical care and recommend that she be granted summary judgment.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendant Atkinson's motion for summary judgment (Dkt. No. 48) be **<u>GRANTED</u>**, and that judgment be entered in her favor; and it is hereby

**ORDERED**, that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with a copy of the unpublished decision in *Santana v. Watson*, No. 13 Civ. 1549 (SAS), 2014 WL 1803308 (S.D.N.Y. May 6, 2014) in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: September 1, 2015
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge



Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Pedro SANTANA, Plaintiff,
v.
Correct Care Solutions, LLC, New York Correct Care
Solutions Medical Services, P.C., Wanda Smithson,
Dr. Raul Ulloa, June Yozzo, Linda Beyer, Westches-
ter County, Jean WATSON, Defendants.

No. 13 Civ. 1549(SAS).
Signed May 6, 2014.

Pedro Santana, Marcy, NY, pro se.

John Murtaugh, Esq., Gaines, Novick, Ponzini, Cossu
& Venditti LLP, White Plains, NY, for Defendants.

***OPINION AND ORDER***
SHIRA A. SCHEINDLIN, District Judge.
**I. INTRODUCTION**
   **\*1** Pedro Santana, presently incarcerated and
proceeding pro se, brings this action pursuant to sec-
tion 1983 of Title 42 of the United States Code.;
Santana sues Westchester County ("the County"),
Correct Care Solutions, LLC ("CCS"), New York
Correct Care Medical Solutions, P.C. ("NYCCS"),
Linda Beyor, Wanda Smithson, Dr. Raul Ulloa, Jean
Watson, and June Yozzo alleging that these defend-
ants deprived Santana of medical treatment in viola-
tion of the Eighth Amendment. Santana seeks injunc-
tive relief, a declaration that defendants violated his
constitutional rights, and punitive damages in the
amount of $9,999,000 against each defendant.

   Defendants move for summary judgment pursu-

ant to Rule 56 of the Federal Rules of Civil Procedure
on the grounds that Santana was not deprived of any
constitutional right and that defendants were not de-
liberately indifferent to Santana's serious medical
needs. For the reasons stated below, defendants' mo-
tion for summary judgment is GRANTED.

**II. BACKGROUND**[FN1]

> **FN1.** The facts recited below are drawn from
> the pleadings, the parties' Local Civil Rule
> 56.1 Statements, the declarations submitted
> in connection with this motion, and the ex-
> hibits attached thereto. These facts are un-
> disputed unless otherwise noted. Where
> disputed, the facts are viewed in the light
> most favorable to the nonmoving party. *See*
> *Beard v. Banks,* 548 U.S. 521, 529–30
> (2006).

   CCS is a limited liability company that provides
medical care to inmates at Westchester County Jail,
and NYCCS is its wholly owned subsidiary.[FN2] Dr.
Ulloa, Nurse Beyer, and Nurse Watson were em-
ployees of CCS working at Westchester County Jail at
all relevant times.[FN3] Smithson is the Deputy Com-
missioner of Corrections for the County, and Yozzo is
the County's former Medical Liaison for the
Westchester County Jail.[FN4]

> **FN2.** *See* Memorandum of Law in Support of
> Defendants' Motion for Summary Judgment
> ("Def.Mem.") at 1.

> **FN3.** *See id.* at 2.

> **FN4.** *See id.*

   On October 10, 2012, Santana was arrested in

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

Westchester County and held for twenty-four hours at the police precinct.[FN5] He was then transferred to Westchester County Jail where Nurse Watson performed his medical intake examination.[FN6] During this examination, Santana informed Watson that he has multiple medical conditions including diabetes, hypertension, high cholesterol, and sleep apnea.[FN7] Santana explained that he had been prescribed a continuous positive airway pressure ("CPAP") machine to treat his sleep apnea.[FN8] Watson made a note in the record that Santana has "unspecified sleep apnea," but told Santana that she could not issue a CPAP machine "without a prescription." [FN9] Santana submitted a health service request for a CPAP machine the next day.[FN10] On October 12, a different nurse took Santana's vitals and observed "no acute distress," but did not respond to his CPAP request or make any notes related to sleep apnea. [FN11] Santana had another medical examination on October 21.[FN12] The record from this examination, electronically signed by Nurse Watson and Dr. Ulloa, notes that Santana's physical and mental status was normal, and he did not report any pain.[FN13] The notes state that Santana intended to submit another health service request for a "sleep apnea machine and evaluation." [FN14] Santana submitted no further health service requests for his sleep apnea until November 9.[FN15]

> **FN5.** *See* Deposition of Santana ("Santana Dep."), Ex. A to Declaration of John M. Murtaugh ("Murtaugh Decl."), counsel for defendants, at 14:2–16:6.

> **FN6.** *Id.* at 18:2–16.

> **FN7.** *See id.* at 18:6–19:4.

> **FN8.** *See* Santana's Rule 56.1 Statement of Material Facts in Opposition to Summary Judgment ("Santana 56.1") ¶ 3. Defendants contend that Santana denied being treated for any illness or health problem other than flat

feet. *See* Defendants' Rule 56.1 Statement of Material Facts in Support of Summary Judgment ("Def.56 .1") ¶ 2.

> **FN9.** Medical Records of Santana ("Medical Records"), Ex. B to Murtaugh Decl., at D00035; Santana Dep. at 19:10–13.

> **FN10.** *See id.* at 21:2–22; Medical Records at D00147.

> **FN11.** Medical Records at D00134.

> **FN12.** *Id.* at D00026–32.

> **FN13.** *Id.*

> **FN14.** *Id.* at D00032.

> **FN15.** *See* Def. 56.1 ¶ 5; Santana 56.1 ¶ 7.

On November 7, Nurse Beyer asked Santana to sign a release authorizing Westchester County Jail medical personnel to obtain medical records related to his sleep apnea.[FN16] The next day, a CCS employee spoke to the office manager at Santana's primary health care provider and was told that the office had no record that Santana was being treated for sleep apnea.[FN17] The employee then called multiple health care providers in an attempt to learn where Santana had been treated.[FN18] She reached a sleep center whose staff could not access its records, but was told to call back the following week.[FN19] The medical staff made further efforts to obtain records related to Santana's sleep apnea treatment over the next three weeks. [FN20]

> **FN16.** *See* Def. 56.1 ¶ 6; Medical Records at D00091.

> **FN17.** *See* Medical Records at D00133.

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

FN18. *See id.*

FN19. *See id.*

FN20. *See id.;* Def. 56.1 ¶ 8.

**\*2** In the meantime, on November 15, Santana submitted a grievance complaining that he had yet to be issued a CPAP machine.[FN21] On November 20, the grievance coordinator denied Santana's grievance after receiving an email from Director of Nursing Michael Kelly finding that there was no record of Santana's sleep apnea at any of the clinics contacted by the medical staff.[FN22] However, in a letter to Smithson, Kelly noted that Santana had submitted a request for care on October 12 and that there was "no documentation to support that the [nurse practitioner] addressed [Santana's] concern about sleep apnea or a CPAP unit." [FN23] Santana appealed this denial. [FN24] On November 28, Dr. Ulloa finally verified Santana's prescription and recorded in his progress notes that Santana would be called and started on a CPAP machine that day.[FN25] However, Santana did not have continuous access to a CPAP machine adjusted to his prescribed setting until approximately five days later, in part because one of the nurses was not authorized to adjust the CPAP machine.[FN26] On December 3, Smithson, who had reviewed Santana's grievance appeal, sent a memorandum to Santana stating that the medical staff had had difficulty verifying that Santana had been prescribed a CPAP machine, but that his complaint had been substantiated and his remedy granted.[FN27] Santana testified that he had access to a CPAP machine on a daily basis and made no complaints from December 3 through December 11 when he was transferred out of the Westchester County Jail.[FN28] Santana was in the custody of the New York City Department of Corrections between December 11, 2012 and January 29, 2013, when he was returned to the Westchester County Jail.[FN29]

FN21. *See* J–255–12 New York State Com-

mission of Correction Grievance Forms ("J–255–12 Grievance Forms"), Ex. C to Declaration of Santana ("Santana Decl."), at 1.

FN22. *See id.* at 3.

FN23. 11/20/12 Letter from Kelly to Smithson, Ex. D to Santana Decl., at 1.

FN24. *See* J–255–12 Grievance Forms at 3.

FN25. *See* Def. 56.1 ¶ 9; Santana 56.1 ¶ 11.

FN26. *See* Santana 56.1 ¶ 5. It is not clear from this record precisely when Santana had access to an adequate CPAP machine. On December 3, Santana complained that his CPAP machine was "being taken away from him before he want[ed] it taken from him." Medical Records at D00127. Records indicate that Santana's CPAP machine was initially kept at "the bubble" where it was not immediately accessible to him. *Id.* at D00127–29, D0014314. Notes in his medical file indicate that Santana was in "no acute distress" when he was seen by medical staff on December 3. *Id.*

FN27. *See* J–255–12 Grievance Forms at 5.

FN28. *See* Def. 56.1 ¶¶ 11–12; Santana Dep. at 27:2–25.

FN29. *See* Def. 56.1 ¶¶ 11–12.

Santana received a CPAP machine as soon as he was returned to the Westchester County Jail.[FN30] This machine was faulty, but he was issued a replacement that same day.[FN31] On January 31, Santana submitted a health service request because his CPAP machine was

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

on the wrong setting and was giving him "too much pressure." [FN32] This problem was not addressed by medical staff for three days.[FN33] Santana testified that he was "continuously complaining" during this time because his chest and stomach were hurting. [FN34] On February 3, Dr. Ulloa ordered that Santana was to be kept in the infirmary until a new CPAP machine could be obtained.[FN35] Medical staff procured a new CPAP machine, but the machine needed service, so Santana was held overnight in the infirmary for observation.[FN36] The notes of the nurse on duty that evening report, "[Santana] is ambulatory and in no acute respiratory distress. He denies c/o or discomfort [of] any nature." [FN37] Santana testified that "everything was fine" with his CPAP machine between February 3 and some time in March, when he had an issue that was "immediately" addressed.[FN38]

> FN30. *See* Medical Records at D00125; Santana Dep. at 30:10–14.

> FN31. *See* Santana Dep. at 30:10–25.

> FN32. *Id.* at 31:3–8; Medical Records at D00142.

> FN33. *See* Def. 56.1 ¶ 15; Medical Records at D000124.

> FN34. Santana Dep. at 32:4–15.

> FN35. *See* Def. 56.1 ¶ 15; Medical Records at D00124.

> FN36. *See* Medical Records at D00122.

> FN37. *Id.*

> FN38. Santana Dep. at 34:6–12.

Santana submitted a grievance on February 10,

claiming that the medical personnel at the Westchester County Jail were not qualified to treat his sleep apnea and that the CPAP machines were faulty.[FN39] This grievance was denied on appeal through the final level of review, the Citizens' Policy and Complaint Review Board.[FN40] Nonetheless, Santana maintains that medical care at the Westchester County Jail is inadequate because there is no sleep specialist on staff, multiple members of the medical staff were not trained to adjust his CPAP machine to the proper setting, and he has been given a CPAP machine on the wrong setting and has had to adjust the settings himself. [FN41] In further support of this contention, Santana has cited to the case of another Westchester County inmate whose sleep apnea treatment was similarly delayed.[FN42] He also cites to a 2009 report stating that grievance forms were unavailable to prisoners at Westchester County Jail, and detailing deficiencies in infection control and dental care.[FN43]

> FN39. *See* J–22–13 New York State Commission of Correction Grievance Forms ("J–22–13 Grievance Forms"), Ex. E to Santana Decl ., at 1.

> FN40. *See id.* at 2–8.

> FN41. *See* Staffing Plan, Ex. H to Santana Decl. (prison does not have a sleep specialist on medical staff); Santana Dep. at 33:10–11 (testifying that Ulloa, Yozzo and a third member of the medical staff "couldn't even program the [CPAP] machine"); *Id.* at 36:9–17 (testifying that Ulloa asked Santana set up his own CPAP machine); Santana 56.1 ¶ 5 (alleging that a nurse practitioner not named as a defendant told Santana she was not authorized to touch the CPAP machine).

> FN42. *Ross v. Westchester Cnty.,* No. 10 Civ. 3937, 2013 WL 5178354, at *6 (S.D.N.Y. Sept. 16, 2013), *appeal dismissed* (Feb. 20,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

2014) (inmate raised a material question of fact as to the County's deliberate indifference to treating his sleep apnea over a three month period).

> FN43. *See* CRIPA Investigation of the Westchester County Jail, Ex. G to Santana Decl., at 23.

**\*3** Prior to Santana's incarceration, Dr. Ahmed Fadil diagnosed him with "moderate" sleep apnea and prescribed a CPAP machine.[FN44] In a "Letter of Medical Necessity" dated August 20, 2013, Fadil characterized Santana's condition as "Severe Obstructive Sleep Apnea," for which a CPAP machine is "medically necessary," and directed that Santana should continue using the CPAP machine indefinitely.[FN45] According to Dr. Fadil, "[f]ailure to treat sleep apnea will result in a wide range of medical complications to name a few, heart attacks, strokes, hypertension, and chronic fatigue [.]"[FN46]

> FN44. Insomnia and Sleep Medicine Records, Ex. A to Santana Decl., at 14.

> FN45. 8/20/13 Letter of Medical Necessity ("Fadil Letter"), Ex. A to Santana Decl., at 1A.

> FN46. *Id.*

Defendants' medical expert, Dr. Fred Lin, who is the Director of the Mount Sinai Sleep Surgery Center, reviewed Santana's medical records and deposition testimony.[FN47] In Dr. Lin's medical opinion, Santana suffers from "moderate" sleep apnea.[FN48] Dr. Lin opines that there are no physiological complications of untreated moderate sleep apnea besides loss of sleep and states with "a reasonable degree of medical certainty" that Santana's "moderate sleep apnea was not the cause of Santana's other medical conditions.[FN49] Santana claims that the failure to treat his sleep apnea

has caused him physical pain, loss of sleep, and emotional anguish stemming from his worries that he would die without access to a CPAP machine.[FN50]

> FN47. *See* Def. Mem. at 12.

> FN48. Report of Dr. Fred Lin ("Lin Report"), Ex. E to Murtaugh Decl., at 1.

> FN49. *Id.* at 2. Santana objects to the use of this expert report because it was submitted after the date initially set by Magistrate Judge Peck, September 30, 2013. *See* Santana 56.1 ¶ 21; Transcript of 9/4/13 Conference before Magistrate Judge Peck at 8:13–25. However, both the discovery deadlines and the deadline to file motions for summary judgment were extended after that conference. *See* 11/4/13 Letter from Murtaugh to Magistrate Judge Peck. Santana does not allege that he did not receive defendants' expert report, or that disclosure was not made in accordance with the new deadlines, merely that defendants did not file an expert report before September 30.

> FN50. *See* Complaint ¶¶ 21, 25; Santana Dep. at 41:13–42:20.

## III. APPLICABLE LAW

### A. Summary Judgment

"Summary judgment is appropriate 'only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law.' "[FN51] "A genuine dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' "[FN52] " 'A fact is material if it might affect the outcome

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

of the suit under the governing law.' " [FN53]

> FN51. *Rivera v. Rochester Genesee Reg'l Transp. Auth.,* 743 F.3d 11,19 (2d Cir.2014) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.,* 583 F.3d 92, 96 (2d Cir.2009)) (other quotations omitted).

> FN52. *Benn v. Kissane,* 510 Fed. App'x 34, 36 (2d Cir.2013) *cert. denied,* 134 S.Ct. 78 (2013) (quoting *General Star Nat'l Ins. Co. v. Universal Fabricators, Inc.,* 585 F.3d 662, 669 (2d Cir.2009)) (other quotations omitted).

> FN53. *Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist.,* 673 F.3d 84, 94 (2d Cir.2012) (quoting *Bessemer Trust Co. v. Branin,* 618 F.3d 76, 85 (2d Cir.2010)).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." [FN54] To defeat a motion for summary judgment, the non-moving party ' "must do more than simply show that there is some metaphysical doubt as to the material facts,' " [FN55] and ' "may not rely on conclusory allegations or unsubstantiated speculation.' " [FN56]

> FN54. *Zalaski v. City of Bridgeport Police Dep't,* 613 F.3d 336, 340 (2d Cir.2010) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).

> FN55. *Valenti v. Penn Mut. Life Ins.* Co., 511 Fed. App'x 57, 58 (2d Cir.2013) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).

> FN56. *Northeast Research, LLC v. One Shipwrecked Vessel,* 729 F.3d 197, 214 (2d Cir.2013) (quoting *Scotto v. Almenas,* 143

F.3d 105, 114 (2d Cir.1998)).

"[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." [FN57] ' "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." [FN58]

> FN57. *Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

> FN58. *Redd v. New York Div. of Parole,* 678 F.3d 166, 174 (2d Cir.2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U .S. 133, 150 (2000)).

Although "[p]ro se parties are entitled to 'extra consideration' on summary judgment motions," they are not relieved from "the usual requirements of summary judgment." [FN59] "Thus, a pro se plaintiff's 'failure to allege either specific facts or particular laws that have been violated renders his attempt to oppose defendants' motion [for summary judgment] ineffectual.' " [FN60]

> FN59. *Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept. 8, 2004) *aff'd sub nom. Maalouf v. Citigroup Global Mkts., Inc.,* 156 Fed. App'x 367 (2d Cir.2005) ( ' "Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment.' " (quoting *Cole v. Artuz,* No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y.

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

Oct. 28, 1999))).

FN60. *Anderson v. City of New York Dep't of Corr.,* No. 11 Civ. 4069, 2013 WL 702918, at *2 (S.D.N.Y. Feb. 26, 2013) (quoting *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994)).

## B. Section 1983

**\*4** "To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) 'that some person has deprived him of a federal right,' and (2) 'that the person who has deprived him of that right acted under color of state ... law.' " [FN61] Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." [FN62] Imposition of liability under section 1983 requires a defendant's direct involvement in the alleged constitutional violation.[FN63] "Because vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must [prove] that each Government-official defendant, through the official's own individual actions, has violated the Constitution." [FN64] Thus, a supervisory official cannot be held liable solely on account of the acts or omissions of her subordinates.[FN65]

FN61. *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005) (quoting *Gomez v. Toledo,* 446 U.S. 635, 640 (1980)).

FN62. *Morris–Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816 (1985)).

FN63. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d

Cir.1991))).

FN64. *Ashcroft v. Iqbal,* 556 U.S. 662, 676–77 (2009) (citations omitted) (rejecting the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution").

FN65. *See Grullon v. City of New Haven,* 720 F.3d 133,138 (2d Cir.2013) ("[I]n order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation.").

In *Monell v. New York City Department of Social Services,* the Supreme Court held that to establish a claim against a municipality under section 1983, a plaintiff must show harm resulting from an identified municipal "policy or custom." [FN66] A municipality may not be found liable simply because one of its employees or agents is guilty of some wrongdoing.[FN67] In the absence of an established written municipal policy, a plaintiff must prove that a practice ' "was so persistent or widespread as to constitute a custom or usage with the force of law,' " [FN68] or that a practice or custom of subordinate employees was ' "so manifest as to imply the constructive acquiescence of senior policy-making officials.' " [FN69] Thus, municipal liability under section 1983 may be established through evidence that "the municipality's practice, as opposed to its formal policy, is to engage in the constitutional violation at issue." [FN70] However, a policy or custom is not established by a single instance of unconstitutional conduct by an employee.[FN71] "Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses." [FN72]

FN66. 436 U.S. 658, 694(1978).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

FN67. *See Cash v. County of Erie,* 654 F.3d 324, 333 (2d Cir.2011).

FN68. *Green v. City of New York,* 465 F.3d 65, 80 (2d Cir.2006) (quoting *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 226 (2d Cir.2004)) (other quotation marks omitted).

FN69. *Id.* (quoting *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 871 (2d Cir.1992)).

FN70. *Green,* 465 F.3d at 80 (citing *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 125–26 (2d Cir.2004)).

FN71. *See City of Oklahoma City v. Tuttle,* 471 U.S. 808, 831 (1985) (Brennan, J., concurring in part and concurring in the judgment) ("To infer the existence of a city policy from the isolated misconduct of a single, low-level officer, and then to hold the city liable on the basis of that policy, would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell.*").

FN72. *Rojas v. Alexander's Dep't Store,* 924 F.2d 406, 409 (2d Cir.1990). *Accord Whalen v. Allers,* 302 F.Supp.2d 194, 203 (S .D.N.Y.2003).

## C. Deliberate Indifference to a Serious Medical Need

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." [FN73] To establish a claim for deliberate indifference, a plaintiff must show that the deprivation of medical care was "sufficiently serious" and that the charged official acted with a "sufficiently culpable

state of mind." [FN74] Thus, "[t]o show that he has been subjected to cruel and unusual punishment, a prisoner must satisfy a standard that includes both objective and subjective components." [FN75]

FN73. *Estelle v. Gamble,* 429 U.S. 97, 101 (1976).

FN74. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994).

FN75. *Taylor v. Goorde* [sic], No. 13–1196–pr., 2013 WL 6670716, at *1 (2d Cir. Dec. 19, 2013) (citing *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009)).

"There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition," [FN76] and "the serious medical need inquiry must be tailored to the specific circumstances of each case." [FN77] The Second Circuit has set forth factors to guide this analysis, including: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment'; (2) whether the medical condition significantly affects daily activities; and (3) the existence of chronic and substantial pain." [FN78] A "serious" medical condition is one that may "produce death, degeneration or extreme pain." [FN79] "In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower." [FN80] When considering an alleged temporary delay or interruption in the provision of medical care, "the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " [FN81]

FN76. *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003).

FN77. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

FN78. *Brock,* 315 F.3d at 162 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)). *Accord Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

FN79. *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005).

FN80. *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006).

FN81. *Id.* (quoting *Smith,* 316 F.3d at 185).

**\*5** In addition to establishing an objectively serious medical need, a plaintiff bringing Eighth Amendment deliberate indifference claims must prove that the defendants acted with a sufficiently culpable state of mind.[FN82] "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety.' "[FN83] "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."[FN84] "Deliberate indifference is 'a state of mind that is the equivalent of criminal recklessness.' "[FN85] Thus, deliberate indifference is more substantial than mere disagreement over a course of treatment, negligence or even medical malpractice.[FN86]

FN82. *See Phelps v. Kapnolas,* 308 F.3d 180, 185–86 (2d Cir.2002).

FN83. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).

FN84. *Farmer,* 511 U.S. at 842.

FN85. *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003).

FN86. *See Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Chance,* 143 F.3d at 703; *Stevens v. Goord,* 535 F.Supp.2d 373, 384 (S.D.N.Y.2008).

**IV. DISCUSSION**

**A. Seriousness**

Santana alleges that he was deprived of sleep apnea treatment in violation of his constitutional rights. It is undisputed that Santana was not given a CPAP machine for the first month and a half of his incarceration at the Westchester County Jail and that he has had intermittent problems with the functioning of several different CPAP machines. However, the record does not establish that Santana's sleep apnea was sufficiently serious such that these lapses in care amounted to an Eighth Amendment violation.

Both Dr. Lin and Dr. Fadil opine that Santana has "moderate" sleep apnea.[FN87] Santana's only evidence that his sleep apnea constitutes a serious medical condition is an unsworn letter in which Fadil contradicts his medical notes by stating that Santana has "severe" sleep apnea.[FN88] In his letter, Fadil states that Santana's CPAP machine treatment is "medically necessary," and goes on to list the complications of untreated sleep apnea: "heart attacks, strokes, hypertension, and chronic fatigue."[FN89] But this opinion is not offered as to Santana's condition. It is a statement solely about the potential complications of sleep apnea in general.[FN90]

FN87. Insomnia and Sleep Medicine Records at 14; Lin Report at 1.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

FN88. Fadil Letter at 1A.

FN89. *Id.*

FN90. I note that Fadil is a treating physician, not a Rule 26 expert. *See* Fed.R.Civ.P. 26(a)(2).

But even if Santana had produced sufficient evidence that his sleep apnea is sufficiently grave to be constitutionally cognizable, because this condition was eventually treated, the focus of the inquiry here is the severity of the delay and interruption in his care rather than the seriousness of his medical condition.[FN91] There is no indication that Santana's health declined during the time he was without a CPAP machine, or that the temporary deprivation significantly affected his daily activities or caused him chronic and substantial pain.[FN92] Prison medical records show that Santana did not mention that he was suffering adverse effects from the lack of a CPAP machine during his October 21 exam or when he was held for observation on February 3. There is no evidence that Santana was ever in acute distress or experienced excessive pain. Therefore, Santana has not established that the delay and intermittent interruption in the provision of a CPAP machine were sufficiently serious to constitute an Eighth Amendment violation.

FN91. *See Salahuddin,* 467 F.3d at 280.

FN92. *See Brock,* 315 F.3d at 162.

**B. Subjective Intent**

**1. Watson**

**\*6** When viewed in the light most favorable to Santana, the facts bearing on Watson's liability do not give rise to a claim for deliberate indifference to a serious medical need. The parties dispute whether Santana informed Watson during his intake exam that he had a prescription for a CPAP machine. Further, it is unclear whether Kelly's letter addressing Santana's grievance refers to Watson or to the nurse practitioner who failed to follow up on the CPAP request during Santana's October 12 medical exam. At most, these facts show whether Watson knew Santana had a prescription for a CPAP machine and failed to follow up on his CPAP request in a timely manner. There is no indication that she deliberately denied access to a CPAP machine, or that she knew that the failure to provide a CPAP machine posed an excessive risk to Santana's health or safety. Summary judgment for Watson is GRANTED.

**2. Ulloa**

Santana claims that Dr. Ulloa denied Santana CPAP treatment and was negligent in the supervision and training of subordinates. As evidenced by his electronic signature on Santana's medical records, Ulloa learned on October 21 that Santana had sleep apnea and was requesting a CPAP machine. But given that Santana did not present objective complications or notify staff that he was in pain during this exam, there is no indication that Ulloa knew or should have known that Santana's condition posed a serious risk of "death, degeneration, or extreme pain."[FN93] Further, because vicarious liability does not apply in section 1983 cases, Santana's claims against Ulloa cannot be based solely on the actions of his subordinates.[FN94] Indeed, the only evidence regarding Ulloa's supervisory actions show that he ordered medical personnel to issue Santana a CPAP machine after speaking with Dr. Fadil. There is no evidence that Ulloa violated Santana's constitutional rights through his own acts or omissions or that he was grossly negligent as a supervisor. Summary judgment for Ulloa is GRANTED.

FN93. *Johnson,* 412 F.3d at 403.

FN94. *See Iqbal,* 556 U.S. at 676–77.

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

**3. Beyer**

Santana has not produced evidence that Beyer was personally involved in the alleged deprivation of medical care. He states that Beyer provided him with a form to authorize the release of his medical records, and after Santana signed this form, the medical staff endeavored to find his CPAP prescription. Thus, the only evidence concerning Beyer's actions shows that she affirmatively aided Santana's treatment. Summary judgment for Beyer is GRANTED.

**4. Yozzo**

Santana claims that Yozzo refused to authorize his CPAP machine, failed to provide needed medical attention, and interfered with the orders of a licensed polysomnographic physician.[FN95] Because Santana has not cited any evidence of these claims, or even stated specific factual allegations against Yozzo, summary judgment for Yozzo is GRANTED.

> FN95. *See* Complaint ¶ 29.

**5. Smithson**

Santana claims that Smithson was negligent in her supervision of subordinates, that she "refused to act on information" of unconstitutional medical practices in 2009, and that she failed to remedy the medical grievance procedure.[FN96] But Santana has failed to adduce any facts that would support a jury finding that Smithson was deliberately indifferent to his constitutional rights or that she was grossly negligent in supervising employees. The record shows that Smithson reviewed and responded to Santana's November 15 grievance about his care, ensuring that his concerns had been investigated and addressed.[FN97] Further, to the extent that Smithson is responsible for remedying medical grievance policy, Santana has neither pled nor substantiated that the medical grievance procedure at the Westchester County Jail is currently ineffective. Santana's only evidence with regard to this claim is the 2009 report finding that grievance forms were una-

vailable to prisoners at the Westchester County Jail.[FN98] Santana has submitted multiple grievances, and has not alleged any difficulty in filing these grievances. Summary judgment for Smithson is GRANTED.[FN99]

> FN96. *Id.* ¶ 27.

> FN97. *See* J–255–12 Grievance Forms at 5; 11/20/12 Letter from Kelly to Smithson at 1.

> FN98. *See* CRIPA Investigation of the Westchester County Jail at 23.

> FN99. Santana's submissions have been construed liberally and interpreted to raise the strongest arguments they suggest. *See Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006). It is unclear whether Santana's claims that Ulloa, Yozzo, and Smithson were negligent are intended as a theory of liability under section 1983, or whether he seeks to bring state law claims against these parties. I do not reach the issue of Ulloa's alleged negligence, but all pendent state law claims against Yozzo and Smithson are dismissed without prejudice. *See* 28 U.S.C. § 1367.

**C.** *Monell* **Claims**

**\*7** Because Santana has not shown that he was deprived of a constitutional right, there is no basis for *Monell* liability.[FN100] Summary judgment for CCS, NYCCS and the County is GRANTED.

> FN100. *See Bobolakis v. DiPietrantonio,* 523 Fed. App'x 85, 87 (2d Cir.2013) (no basis for imposing municipal liability where plaintiff had not suffered a violation of his constitutional rights).

**V. CONCLUSION**

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. The Clerk of the Court is directed to close this motion (Docket No. 51) and this case.

SO ORDERED:

S.D.N.Y.,2014.
Santana v. Watson
Slip Copy, 2014 WL 1803308 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.