UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MICHAEL AZIZ ZARIF SHABAZZ,

                                Plaintiff,

                                               9:12-CV-1372
v.                                              (NAM/TWD)

T. HOWARD, et al.

                                Defendants.
_____

APPEARANCES:                        OF COUNSEL:

MICHAEL AZIZ ZARIF SHABAZZ
72-B-0089
Plaintiff pro se
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953


HON. ERIC T. SCHNEIDERMAN             C. HARRIS DAGUE, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>ORDER AND REPORT-RECOMMENDATION</u>

      Pro se Plaintiff Michael Aziz Zarif Shabazz initially commenced this civil rights action

under 42 U.S.C. § 1983 against sixteen defendants.  (See generally Dkt. No. 1.)  The only claims

that survived initial review under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A were: (1) Eighth

Amendment excessive force claims against Defendants Upstate Correctional Facility ("Upstate")

Corrections Officers R. Rhondo and B. Burdett, and Upstate Sergeant T. Howard; and (2)

Eighth Amendment medical deliberate indifference claims against Defendants R.N. Atkinson, Dr. Jerry "Roe," and Dr. Douyon de Azevedo. (Dkt. No. 11 at 23.[1]) Defendant Atkinson was subsequently granted summary judgment. (Dkt. No. 57.)

Defendants Rhondo, Burdett, Howard, and Douyon de Azevedo presently move on Eleventh Amendment grounds for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 on Plaintiff's claims for money damages against them in their official capacities. (Dkt. No 90.) Defendant Douyon de Azevedo also moves for summary judgment on Plaintiff's Eighth Amendment medical indifference claim against him. *Id.*

Plaintiff requested and was granted an extension of time to respond to Defendants' September 9, 2016, motion from October 3, 2016, to November 14, 2016. (Dkt. Nos. 93 and 94.) Plaintiff's only response to Defendants' motion is a November 13, 2016, letter to the Hon. Norman A. Mordue, Senior District Court Judge, regarding impediments to the preparation of a response to the motion, and the possibility that Plaintiff had drafted part of his work on toilet paper and mistakenly sent it to the Court and/or Assistant Attorney General. (Dkt. No. 95.)

For reasons explained below, the Court recommends that Defendants' motion for partial summary judgment be granted.

## I.  FACTUAL BACKGROUND

Plaintiff is an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and has been housed at Upstate at all times relevant to

---

[1] Page references to document identified by CM/ECF docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

this action. (Dkt. Nos. 1 at ¶ 5; 90-5 at ¶ 3.[2]) In his verified complaint, Plaintiff alleges that on August 7, 2009, Defendants Rhondo, Burdett, and Howard used excessive force against him, breaking his ankle and causing other injuries.[3] (Dkt. No. 1 at ¶¶ 15-28.) Rhondo, Burdett, and Howard have not moved for summary judgment on the excessive force claims brought against them in their individual capacities. (Dkt. No. 90-3 at 4.)

Dr. Douyon de Azevedo, who is now retired, worked for DOCCS as a Facility Health Services Director and physician for eight years. (Dkt. No. 90-4 at ¶ 1.) He worked at Upstate for three of those years. *Id.* Plaintiff claims that Douyon de Azevedo acted with deliberate indifference to his serious medical needs when on December 23, 2009, he ordered discontinuance of Plaintiff's facility-issued crutch/wheel chair order before Plaintiff's ankle was sufficiently healed, causing him to fall on several occasions and exacerbating his injury and pain. (Dkt. Nos. 1 at ¶¶ 51-57; 90-4 at ¶ 4.) Plaintiff also alleged in his complaint that Douyon de Azevedo's "bogus posture and unfettered false conclusion that [Plaintiff's] broken left leg was healed . . . exacerbated [his] grave physical injuries and pain." *Id.* at ¶ 54. Plaintiff complained that as a result of losing his crutches calcium forming in his calf broke and drained down to his ankle, and that the plate and screws inserted in his ankle subjected him to ongoing pain and suffering by putting pressure on his foot and leg. *Id.* at ¶ 56.

Plaintiff was admitted to the Alice Hyde Medical Center on August 7, 2009, with a left

---

[2]  Paragraph numbers are used where documents identified by docket number contain consecutively numbered paragraphs.

[3]  Plaintiff's complaint in this case was properly verified by declaration under 28 U.S.C. § 1746. *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with §1746).

distal tibia shaft/pilon fracture and left distal fibula fracture.  (Dkt. Nos. 90-4 at ¶ 9; 91 at 3, 5.)

Surgery involving an open reduction and internal fixation of the fractures, using plates and

screws, was performed on the date of admission.  *Id*. at 5.  The operation report indicated that

Plaintiff would be on non-weight bearing status of the lower left leg for the next six weeks

minimum, and that he should be provided with crutches or a walker for ambulation aid.  *Id*. at 6.

Plaintiff's hospital discharge instructions provided that he have a posterior splint on his lower

left leg for two weeks and place no weight on his lower left leg for two months.  (Dkt. No. 91 at

2.)

Plaintiff was returned to Upstate on August 10, 2009, and was housed at the facility

hospital for observation.  (Dkt. No. 90-4 at ¶ 11.)  On September 11, 2009, Plaintiff's leg was

examined by Orthopedist Dr. Dragon Macelaru on a consultation ordered by the Upstate medical

staff.  (Dkt. Nos. 90-4 at ¶ 12.)  Dr. Macelaru ordered that Plaintiff continue his non-weight

bearing status on his lower left leg until he had a follow up examination and new x-ray in 6-8

weeks.  *Id*.  After the examination, Plaintiff was discharged from the infirmary and cleared to

return to his housing unit with instructions that he continue with non-weight bearing on his

lower left leg for 6-8 weeks.  (Dkt. No. 90-4 at ¶ 13.)  Plaintiff was issued a crutch/wheelchair

permit.  *Id*.

Plaintiff was routinely treated after being discharged from the infirmary, provided

prescription and analgesic medications, given examinations, and provided opportunities for

treatment by physical therapists and consultations with his Orthopedist.  (Dkt. Nos. 90-4 at ¶ 14;

91 at 9-13, 28, 43, 48 and 49.)  A November 9, 2009, x-ray of Plaintiff's left lower leg showed

"near anatomic alignment" in his left ankle.  (Dkt. Nos. 90-4 at ¶ 14; 91 at 60.)

Plaintiff's medical records reveal times when he refused treatment, medication, and medical services following his release from the infirmary. (Dkt. No. 90-4 at ¶ 15.) Plaintiff refused to attend physical therapy sessions on October 14 and 22, 2009, and November 5, 2009; refused his October 30, 2009, follow-up appointment with the Orthopedist; refused his prescription Naproxen on August 26 and 27, 2009; and refused medical examinations and assessments on September 5, 2009, October 27 and 31, 2009, and December 16, 2009. (Dkt. Nos. 90-4 at ¶ 15; 91 at 9-11, 28, 39-40, 56-58.) Plaintiff also either failed to appear for nurses sick call examination or refused to state if he had any complaints during sick call on 23 days between September 19, 2009, and December 20, 2009. (Dkt. Nos 90-4 at ¶ 15; 91 at 711-32.)

On December 23, 2009, Dr. Douyon de Azevedo issued an order to discontinue Plaintiff's use of crutches/wheelchair outside of his cell. (Dkt. Nos. 90-4 at ¶16; 91 at 27.) The order and medical justification stated that Plaintiff's primary care provider was to evaluate the need for Plaintiff to use crutches outside of his cell and check on splint and/or cast; Plaintiff had refused Orthopedist follow-up and physical therapy ordered on September 11, 2009; the Orthopedist recommended 6-8 more weeks of non-weight bearing status on September 11, 2009; and Plaintiff was walking in his cell without crutches. *Id*.

According to Dr. Douyon de Azevedo, his order was issued more than a month past the September 11, 2009, 6-8 weeks recommended by the examining Orthopedist, and that his decision was medically sound based on Plaintiff' medical condition; length of time post-surgery; the recommendations of his surgeon and Orthopedist; his documented pattern of refusing treatment options; and reports of his walking without crutches in his cell. (Dkt. No. 90-4 at ¶ 18.) Douyon de Azevedo also noted that there is a treatment interest in returning a patient

suffering from a fracture and surgical procedure like Plaintiff to weight bearing status because indefinite lack of use of the ankle could result in limitation of use, atrophy of surrounding muscles, limitations or delays on return to normal use, and potential loss of bone. (Dkt. No. 90-4 at ¶ 19.)

## II.  STANDARD OF REVIEW

Pursuant to Rule 56, summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Under those standards, the party seeking summary judgment bears the initial burden of showing, through the submission of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute is "genuine" if the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League*

*Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding pro se, the court is obliged to "read [the pro se party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Ruotolo v. IRS*, 28 F.3d 6, 8 (2d Cir. 1994) (district court "should have afforded [*pro se* litigants] special solicitude before granting the . . . motion for summary judgment"). However, "a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) JCF, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[4] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

Plaintiff's failure to oppose Defendants' partial summary judgment motion does not mean that the motion is to be granted automatically. An unopposed motion for summary judgment may be granted "only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law."[5] *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) (citations and internal quotation marks omitted); *see also Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) (where "the non-moving party 'chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's

---

[4] Plaintiff will be provided with copies of unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

[5] N.D.N.Y. L.R. 7.1(b)(3) provides that "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."

submissions to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.'") (quoting *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001)).

In *Jackson v. Federal Exp.*, 766 F.3d 189, 198 (2d Cir. 2014), the Second Circuit made clear that "[i]n the case of a pro se, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate." In doing so, "the court may rely on other evidence in the record, even if uncited." *Id.* at 194 (citing Fed.R.Civ.P. 56(c)(3)). "A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . ." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (internal citations omitted).

This Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion. *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002).[6] For this reason, courts in this district have routinely enforced L.R. 7.1(a)(3)[7] in cases in which the non-movant

---

[6] *See also Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030-31 (9th Cir. 2001) (holding it unfair to the district court, other litigants, and the movant to impose a duty on the district court to "search and sift the factual record for the benefit of a defaulting party.")

[7] The Second Circuit has recognized that district courts "have the authority to institute local rules governing summary judgment submissions, and have affirmed summary judgment rulings that enforce such rules. Rules governing summary judgment practice are essential tools for district courts permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of hunting through voluminous records without guidance from the parties." *N.Y. State Teamsters Confer, Pension and Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 647 (2d Cir. 2005) (citation and internal punctuation and quotation marks omitted).

L.R. 7.1(a)(3) provides that on a summary judgment motion movants submit a "Statement of Material Facts" setting forth in numbered paragraphs, each material fact about which the moving party contends there is no genuine issue. Each fact shall set forth a specific

has failed to respond to the movant's Rule 7.1 Statement of Material Facts by deeming the facts

to have been admitted where: (1) the facts are supported by evidence in the record;[8] and (2) the

nonmovant, if proceeding pro se, has been specifically advised of the possible consequences of

failing to respond to the motion.[9] *See Champion,* 76 F.3d at 486; *see also Jackson*, 766 F.3d at

194 (a non-movant who fails to respond to a summary judgment motion "runs the risk of

unresponded-to-statements of undisputed facts proffered by the movant being deemed

admitted.") While pro se litigants are undeniably "entitled to some measure of forbearance

when defending against summary judgment motions, the deference owed to pro se litigants . . .

does not extend to relieving them of the ramifications associated with the failure to comply with

the court's local rules." *Liberati v. Gravelle*, No. 9:12-CV-00795 (MAD/DEP), 2013 WL

5372872, at *6 (N.D.N.Y. Sept. 24, 2013) (internal citations and punctuation omitted).

In light of Plaintiff's failure to oppose Defendants' summary judgment motion, the facts

set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 90-2) that are, as shown

below, supported by record evidence and are uncontroverted by nonconclusory factual

---

citation to the record where the fact is established . . . . The moving party shall also advise pro se litigants about the consequences of their failure to respond to a motion for summary judgment . . . . The opposing party shall file a response to the Statement of Material Facts . . . . <u>The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert</u>."

[8] *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[9] Defendants have complied with L.R. 7.1(a)(3) and L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. No. 90-1.)

allegations in Plaintiff's verified complaint, are accepted as true. *See McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at *3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert properly supported facts set forth in a L.R. 7.1(a)(3) statement of material facts where plaintiff did not oppose defendant's motion for summary judgment); *Douglas v. Perrara*, No. 9:11-CV-1353 (GTS/RFT), 2013 WL 5437617, at *3 (N.D.N.Y. Sept. 27, 2013) ("Because Plaintiff [who filed no opposition,] has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) . . ., supplemented by Plaintiff's verified Complaint . . ., as true.").

As to any facts not contained in Defendants' Statement Pursuant to Rule 7.1, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Liberati*, 2013 WL 5372872, at * 7 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.   ANALYSIS

### A.      Official Capacity Claims

Plaintiff has sued Defendants for money damages in their official capacities under § 1983. (Dkt. No. 1 at 1.) The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh*, 438 U.S. 781, 782 (1978). The Supreme Court has determined that § 1983 does not override States' Eleventh Amendment immunity. *Quern v. Jordan*, 440 U.S. 332, 342 (1979). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state. *Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir.

2006).  Thus, the Eleventh Amendment bars all money damages claims against state officials

acting in their official capacities, including the Defendants herein.  *Kentucky v. Graham*, 473

U.S. 159, 167-68 (1985).

Therefore, the Court recommends that Defendants be granted summary judgment on

Plaintiff's claims for money damages under § 1983 asserted against them in their official

capacities on Eleventh Amendment immunity grounds.

### B.     Medical Indifference Claim Against Dr. Douyon de Azevedo

"To establish an Eighth Amendment violation arising out of inadequate medical

treatment, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'"

*Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97,

104 (1976)).  The deliberate indifference standard is comprised of an objective and a subjective

component.  "Objectively, the alleged deprivation must be 'sufficiently serious,' in the sense that

'a condition of urgency, one that may produce death, degeneration, or extreme pain' exists."

*Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

"Subjectively, the charged official must act with a sufficiently culpable state of mind."

*Id*.  The subjective element of deliberate indifference "entails something more than mere

negligence . . . [but] something less than acts or omissions for the very purpose of causing harm

or with knowledge that harm will result."  *Farmer v. Brennan*, 511 U.S. 825, 835 (1994); *see*

*also Estelle*, 429 U.S. at 106 ("A [prisoner's] complaint that a physician has been negligent in

diagnosing or treating a medical condition does not state a valid claim of medical mistreatment

under the Eighth Amendment.").

"An official acts with the requisite deliberate indifference when that official 'knows of

and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Farmer*, 511 U.S. at 837.)  More than medical malpractice is required to establish a constitutional violation.  "Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness. . . ." *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011).

Even assuming for purposes of this motion that Plaintiff's ankle fracture still constituted a serious medical need as of December 23, 2009, when Dr. Douyon de Azevedo issued the order to discontinue Plaintiff's facility-issued permit for use of crutches and a wheelchair outside of his cell, the evidence in the record shows an absence of deliberate indifference on the part of Douyon de Azevedo in issuing the order.  The evidence submitted by Douyon de Azevedo that well supports his position that the discontinuance of the crutch order was warranted and medically justified includes: (1) the more than four month post-surgery time period during which Plaintiff was allowed to use crutches, well beyond the two months recommended by Plaintiff's surgeon following the surgery and the Orthopedist's recommendation on September 11, 2009, that Plaintiff continue a non-weight bearing status for another 6-8 weeks; (2) the treatment interest in returning a patient suffering from Plaintiff's type of fracture and surgery to weight bearing status, including concerns that indefinite lack of use of the ankle could result in limitations or delays in return to normal use, atrophy of surrounding muscles, and potential loss of bone strength; (3) the November 9, 2009, x-ray report showing "near anatomic alignment"; (4) Plaintiff's refusal to follow his recommended course of treatment; and (5) Plaintiff's non-use

of crutches while walking in his cell.  (Dkt. No. 90-4 at ¶¶ 10-19.)

The Court finds that the conclusory allegation in Plaintiff's complaint that Dr. Douyon de Azevedo's "bogus posture and unfettered false conclusion that [Plaintiff's] broken leg was healed . . . exacerbated [his] grave physical injuries and pain," has no evidentiary support in the record and is inadequate to raise a material issue of fact on the issue of deliberate indifference.[10] (Dkt. No. 1 at ¶ 54.)  In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit instructed that "to defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation."  "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Id; see also Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.")  Based upon the foregoing, the Court recommends that Dr. Douyon de Azevedo be granted summary judgment on Plaintiff's Eighth Amendment medical indifference claim.

## C.    Dr. Jerry "Roe"

The claims alleged against Dr. Jerry "Roe" in Plaintiff's complaint are essentially the same as those alleged against Dr. Douyon de Azevedo.  (*See* Dkt. No. 1 at ¶¶ 51-57.)  There is nothing in the docket sheet suggesting that Dr. Jerry "Roe" has been identified or served in this action commenced September 7, 2012, despite issuance of a March 18, 2014, Decision and Order by Judge Mordue ordering Plaintiff to "take reasonable steps through discovery to

---

[10]  Inasmuch as Plaintiff failed to respond to Defendants' motion, his verified complaint, treated as an affidavit, is the only evidence in the record submitted by Plaintiff that is available for consideration by the Court.

ascertain the identity of Dr. Jerry "Roe", a Doctor, and when identified, seek to amend the complaint to add the individual as a defendant in this action pursuant to Fed. R. Civ. P. 15(a)." (Dkt. No. 11 at 25.)  Discovery was completed in this case, except as to Dr. Douyon de Azevedo, on March 17, 2015.  (Dkt. No. 43, Text Order dated March 17, 2015.)  The deadline for discovery solely as to Douyon de Azevedo was extended to July 8, 2016.  (Dkt. No. 81, Text Order dated March 31, 2016.)

The Court finds that Plaintiff has had ample time and opportunity to discover the identify of Dr. Jerry "Roe" and to serve him.  Given Plaintiff's failure to do so, the Court recommends the *sua sponte* dismissal of the Dr. Jerry "Roe" from the action for failure to prosecute.  *See Delrosario v. City of N.Y.,* No. 07 Civ. 2027 (RJS), 2010 WL 882990, at * 5 (S.D.N.Y. March 4, 2010) (*sua sponte* dismissing claims against John Doe Defendants for failure to prosecute [w]here discovery was closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants."); *Coward v. Town & Vill. of Harrison*, 665 F.Supp. 2d 281, 301 (S.D.N.Y. 2009) ("Where a plaintiff had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the defendant's name . . ., the plaintiff simply cannot continue to maintain a suit against the John Doe defendant.") (citation and internal quotation marks and punctuation omitted).

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for partial summary judgment (Dkt. No. 90) be **GRANTED IN ITS ENTIRETY**; and it is further

**RECOMMENDED** that Plaintiff's claims against Dr. Jerry "Roe" be **DISMISSED WITHOUT PREJUDICE** from this action due to his failure to prosecute; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[11]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: May 5, 2017
Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[11]  If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green
Haven Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the
gate officer before being released to attend the services.
(Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*
Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048– 49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non- moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174

F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

**B. *Constitutional Claim***

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to

maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III,

Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1       In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**End of Document**                                          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 882990
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jairo DELROSARIO, Plaintiff,

v.

The CITY OF NEW YORK, et al., Defendants.

No. 07 Civ.2027(RJS).
|
March 4, 2010.

West KeySummary

**1**   **Civil Rights**

🔑   Criminal Law Enforcement;Prisons

Neither official in charge of prisoner
movement nor official in charge of security
had authority to make final policy decisions
for the city with respect to the protection
or housing of prisoners at penal institution,
as required to hold the city liable under
§ 1983 for officials' alleged unconstitutional
acts. Inmate alleged that officials deliberately
ignored a known risk to his safety from
fellow prisoners, who repeatedly threatened
and assaulted inmate for cooperating with
authorities, but the only reference to them was
prosecutor's identification of their respective
roles at institution. No information was given
with respect to what authority each had, what
guidelines and policies they were subject to,
and what oversight was in place. 42 U.S.C.A.
§ 1983.

Cases that cite this headnote

**Attorneys and Law Firms**

Robert B. Marcus, Schwartzpfel, Truhowsky, Marcus,
P.C., Jericho, N.Y., for Plaintiff.

Mark D. Zuckerman, Office of the Corporation Counsel
of the City of New York, New York, N.Y., for
Defendants.

## MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge.

**\*1**   Plaintiff Jario Delrosario brings this action against
the City of New York ("the City"), Manhattan Assistant
District Attorney Susan Lanzatella, and ten John Doe
Defendants pursuant to 42 U.S.C. § 1983 for alleged
deprivations of his civil rights. Now before the Court is
Defendants' motion to dismiss Plaintiff's claims pursuant
to Federal Rule of Civil Procedure 12(b)(6). In the
alternative, Defendants move for summary judgment
pursuant to Rule 56(a). For the reasons set forth below,
Defendants' motion for summary judgment is granted.

## I. BACKGROUND

Plaintiffs lawsuit stems from injuries inflicted by other
inmates while he was incarcerated at Riker's Island
Correctional Facility ("Riker's"), located in Bronx
County, New York and part of the New York City
Department of Corrections ("DOC"). Plaintiff alleges
that, although he was repeatedly threatened and assaulted
by other inmates for acting as a cooperating witness,
Defendants failed to take steps necessary to protect him
from further violence. In addition, Plaintiff alleges that
Riker's personnel denied him medical care after he was
assaulted.

### A. Facts

#### 1. Plaintiff's Arrest, Attack, and Injury

Plaintiff was arrested on September 1, 2005 and charged
with various crimes under New York state law arising
out of a "sting" operation. (Defs.' 56.1 ¶ 3.) After he
was arrested, Plaintiff was taken to and detained at
Riker's. (*Id.* ¶ 4.) Defendant Lanzatella, an assistant
district attorney and chief of the Narcotics Gang Unit of
the New York City Special Narcotics Prosecutor's Office
("SNPO"), was assigned to prosecute Delrosario and his
co-defendants. (*Id.* ¶ 7.) Lanzatella was assisted by the
only attorney under her supervision at that time, Nigel
Farinha. (Pl.'s 56.1 ¶ 3; Defs.' 56.1 ¶ 25.)

Within two months of his arrest, Plaintiff became a cooperating witness. (Defs.' 56.1 ¶ 11.) In the course of his cooperation, Plaintiff was removed from Riker's and taken to the SNPO as many as 60 times for interviews with investigators and prosecutors. (Decl. of Robert B. Marcus ("Marcus Deck") Ex. A (Dep. Tr. of Susan Lanzatella ("Lanzatella Dep. Tr.")) at 65:25–66:2.) Throughout his cooperation, Plaintiff was repeatedly threatened by his co-defendants on account of the cooperation that they suspected he was providing to authorities. (Pl.'s 56.1 ¶ 8.) Plaintiff's attorney in the state criminal matter, Barry Weinstein, testified that he repeatedly advised both Lanzatella and Farinha of the threats against Plaintiff. (Pl.'s 56.1 ¶ 9; Marcus Decl. Ex. C (Dep. Tr. of Barry Weinstein ("Weinstein Dep. Tr.")) at 12:21–14:21.) [1]

In January 2006, Plaintiff was assaulted at Riker's. (Pl.'s 56.1 ¶ 10; Weinstein Dep. Tr. at 18:7–12.) Weinstein testified that he quickly contacted either Lanzatella or Farinha and so informed them. (*Id.* at 19:7.) It is unclear whether this attack was connected to Plaintiffs cooperation. Plaintiff testified that he did not know why he was attacked (Delrosario Dep. Tr. at 50:10–11), but he also testified that "the same people on my case" were responsible for the attack (*id.* 48:9). Lanzatella states that she was not aware of any January assault. (Supp. Lanzatella Decl. ¶ 3.)

**\*2** After the January assault, Plaintiff was moved to another Riker's building, which he describes as unit C73. (Delrosario Dep. Tr. at 52:5–7.) Plaintiff continued to be threatened in his new housing unit. (*Id.* at 53:13–56:25.) The record indicates that Plaintiff was again assaulted on March 1, 2006. (Weinstein Dep. Tr. at 15:19–20; Marcus Decl. Ex. E (Report of Arthur Elias).) [2] Weinstein testified that Plaintiff was then brought before Lanzatella on March 3, 2006 for further interviews. (Weinstein Dep. Tr. at 16:l–5.) [3] Weinstein testified that after the March 3, 2006 meeting, Lanzatella or Farinha informed Weinstein that Lanzatella was sending a letter "immediately" or "right away" to have Plaintiff moved from Riker's to another facility. (*Id.* at 17:10–13; 26:20–27:10; 27:17–25.)

Plaintiff testified that on March 8, 2009, fearing further violence, he contacted his attorney and asked to be relocated. (Delrosario Dep. Tr. at 60:4–22.) In response, prison officials prepared him to be moved and transferred him to a holding cell. (*Id.* at 60:15–22.) While awaiting

transfer to another facility on March 9, 2006, Plaintiff was assaulted by another inmate and suffered serious facial injuries, including a broken jaw. (Pl.'s 56.1 ¶ 16.) Plaintiff does not know the identity of his assailant or whether the assault was related to his cooperation. (Delrosario Dep. Tr. at 61:8–62:13.)

What steps, if any, were taken by officials between the March 1 and March 9 assaults remains unclear. During discovery, Defendants produced a letter written by Lanzatella and addressed to either Captain Vasatoro, the captain in charge of prisoner movement at Riker's, or Captain Boden, the captain in charge of security at Riker's. (Lanzatella Dep. Tr. at 102:10–103:3.) [4] The letter bears the date of March 3, 2006 and states:

> I am requesting that the above-named inmate [Delrosario] be moved for security reasons from GMDC [at Riker's] where he is currently being held to BBKC [another DOC facility]. The above-named inmate, who was arrested in an armed robbery conspiracy with ten co-defendants, has been repeatedly assaulted while being held at GMDC in the past few weeks, including most recently when his jaw was broken. The inmate is needed as a witness in an ongoing investigation.

> Thank you for your assistance in this matter and please feel free to call should you have any additional questions. (Zuckerman Decl. Ex. F.) The letter is a copy retrieved from Lanzatella's computer; no originals were found. (*See* Lanzatella Dep. Tr. at 104:16–21.) It also references Plaintiff's broken jaw, which did not occur until March 9, 2006. (Pl.'s 56.1 ¶ 16.) Lanzatella speculates that she first wrote a draft on March 3, 2006, in response to an attack on Plaintiff, but did not send it because she then learned that the attack was unrelated to his cooperation. (Lanzatella Dep. Tr. at 122:24–123:24.) She then edited and sent it after the March 9, 2006 attack. (*Id.*)

**\*3** Weinstein testified, however, that Lanzatella or Farinha informed him that a letter was sent on March 3, 2006, the date appearing in the letter. (Weinstein Dep. Tr. at 17:10–13; 26:20–27:10; 27:17–25.) Further, he testified that Farinha told him that the letter had been sent but was disregarded by officials at the DOC because of animus towards Delrosario. (Weinstein Dep. Tr. at 16:10–17:6.) Farinha denies that he made such statements. (Marcus Decl. Ex. B (Dep. Tr. of Nigel

Farinha (Farinha Dep. Tr.)) at 84:4–22.) Because the final version contains information concerning the March 9, 2006 attack, and based on Farinha's representations to Weinstein that it was originally sent on March 3, Plaintiff concludes that the letter was originally sent on March 3 and was edited and resubmitted on March 15, 2006. This conclusion is partially corroborated by information taken from Lanzatella's computer, which indicates the letter was created March 3, 2006 and modified on March 15, 2006. (Marcus Decl. Ex. F.)

After spending time at Bellevue hospital and recovering from his injuries, Plaintiff was transferred to the Manhattan Detention Center, often referred to as the "Tombs." (Delrosario Dep. Tr. at 66:14–15.) After some of his co-defendants were also sent to the Tombs, Plaintiff was again transferred, this time to the Vernon C. Bain Correctional Center, or the "Boat," another City correctional facility. (*Id.* at 67:1–6.) Finally, Plaintiff was transferred to federal custody.

2. Procedures or Practices for Cooperating Witnesses

The DOC policies and procedures allow an "inmate [to] be placed into Close Custody Housing either by his or her own request or pursuant to the Department's determination that such housing is necessary and appropriate." (Decl. of Harry Ahl Ex. C III.C.) Close Custody Housing can be used for inmates' own protection. (*Id.* at II.A.) The procedures specifically require that anytime a staff member has reason to believe that an inmate is in danger, or anytime an inmate so requests, he must be placed in Close Custody Housing until a captain arrives. (*Id.* III.C.2.a.) The policy lays out further procedures for determining when an inmate qualifies for such housing, as well as his right to a hearing and other administrative process. (*Id.*)

Lanzatella's practice was "not to get involved with the protection of cooperating witnesses while they were in custody because NYC Department of Corrections has its own criteria for housing inmates" that the DA's office was not involved with. (Def.'s 56.1 ¶ 12.) Further, any requests or recommendations that her office made were "non-binding and whether NYC Department of Corrections honored it was out of [Lanzatella's] hands." (*Id.* ¶ 13.) She testified that if there was a risk to any witness, however,

she would inform the DOC. (*See* Lanzatella Dep. Tr. at 112:8–15.)

B. Procedural History

Plaintiff filed this lawsuit on March 9, 2007, and it was assigned to the Honorable Kenneth M. Karas, District Judge. On September 4, 2007, the case was reassigned to the docket of the undersigned. Plaintiff filed the Amended Complaint ("AC") on May 20, 2009, after discovery had closed. On July 17, 2009, Defendants moved to dismiss the Amended Complaint or, in the alternative, for summary judgment and submitted their Local Rule 56.1 statement. Plaintiff submitted its opposition and own Rule 56.1 statement on September 8, 2009. The motion became fully submitted on September 17, 2009.

**\*4** The Amended Complaint purports to contain a single claim under Section 1983. (AC ¶ 64.) Read more closely, however, the Amended Complaint actually asserts several claims against various Defendants. "Count One" alleges that Defendants acted with "deliberate indifference in failing to transfer Plaintiff to another facility and/or remove him from the general population and/or place him in protective custody." (AC ¶ 68.) It also alleges that "Defendants acted with deliberate indifference in intentionally denying and/or delaying Plaintiff's access to medical care and/or attention." (*Id.* ¶ 69.) Finally, it alleges that the Defendants were "supervisors and/or final decision makers" who acted with deliberate indifference towards Plaintiff in failing to adequately supervise, train, or discipline Defendants, "thereby causing said Defendants in this case to engage in the above-mentioned conduct." (*Id.* ¶¶ 71–72.)

Thus, the AC seeks redress from Defendants for both failing to prevent Plaintiffs injuries and for refusing or delaying medical treatment after the March 9, 2006 attack. Liberally construed, the Amended Complaint seeks to impose municipal liability on the City for DOC's failure to adequately safeguard Plaintiff, DOC's failure to timely treat Plaintiff after the March 9, 2006 attack, and Lanzatella's failure to prevent the March 9, 2006 attack. In addition, the Amended Complaint can be read to set forth a claim against Lanzatella in her individual capacity for failing to prevent the assaults, as well as individual claims against the John Doe Defendants for both injuries.

Because Plaintiff has utterly failed to produce evidence to support many of the allegations in the Amended Complaint, the Court will, for reasons of judicial economy, treat Defendants motion as one for summary judgment.

## II. DISCUSSION

### A. Legal Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a court may not grant a motion for summary judgment unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Bronx Household of Faith v. Bd. of Educ. of City of N.Y.,* 492 F.3d 89, 96 (2d Cir.2007). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Anderson v. Liberty lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *see Anderson,* 411 U.S. at 248 (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). As such, "if 'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.' " *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir.2007) (quoting *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir.1997)) (alteration in original).

### B. Claims Against John Doe Defendants

**\*5** Plaintiff's claims against the John Doe Defendants must be dismissed for failure to prosecute. Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss those Defendants

without prejudice. *See Coward v. Town and Village of Harrison,* 665 F.Supp.2d 281, 300–01 (S.D.N.Y.2009); *Jeanty v. County of Orange,* 379 F.Supp.2d 533, 536 n. 3 (S.D.N.Y.2005). Therefore, Plaintiff's claims against the John Doe Defendants are dismissed without prejudice.

### C. Municipal Liability for the Acts of Prison Officials

Plaintiff alleges that the City is liable for the DOC's failure to adequately transfer, segregate, or otherwise protect him while he was in custody. (AC ¶¶ 68, 71.) Similarly, Plaintiff seeks to hold the City liable for the DOC's failure to timely treat Plaintiffs injuries after the March 9, 2006 attack. (AC ¶¶ 69, 71.) These allegations attempt to state a claim against New York City for liability under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Defendants move for summary judgment on this claim, arguing, *inter alia,* that Plaintiff has not identified a causal link between any municipal custom or policy and the alleged constitutional violations. (Defs.' Mem. at 7.) For the reasons stated below, the Court grants Defendants' motion for summary judgment with respect to these claims.

#### 1. Applicable Law

"A municipality may be held liable as a 'person' for purposes of Section 1983 when a civil rights violation results from a municipality's policy or custom." *Koulkina v. City of N.Y.,* 559 F.Supp.2d 300, 314 (S.D.N.Y.2008). "A plaintiff making a *Monell* claim against a municipality must establish three elements: '(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.' " *Blazina v. Port Auth.,* No. 06 Civ.481(KNF), 2008 WL 919671, at \*6 (S.D.N.Y. Apr.1, 2008) (quoting *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983)).

An official policy or custom can be demonstrated in a number of ways. First, such a policy can be shown where the agency "promulgates an official policy," or "a municipal employee with final policymaking authority" undertakes an unconstitutional act. *Warheit v. City of N.Y.,* No. 02 Civ. 7345(PAC), 2006 WL 2381871, at \*12 (S.D.R.Y. Aug. 15, 2006); *accord Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Second, a custom or practice may

be demonstrated through behavior that is " 'so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.' " *Davis v. City of N.Y.,* 228 F.Supp.2d 327, 337 (S.D.N.Y.2002) (quoting *Silva v. Worden,* 130 F.3d 26, 31 (1st Cir.1997)). Third, an official policy can be established by a municipality's failure to adequately train or supervise its agents or employees. *See Amnesty Am.,* 361 F.3d at 127–28 & 127 n. 8. Finally, a plaintiff can state a *Monell* claim where he or she demonstrates that the municipality failed to discipline employees or agents who violate civil rights because "the persistent failure to discipline [can] give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell." Batista,* 702 F.3d at 397.

### 2. Analysis

#### a. Decisions by Final Policymakers

**\*6** Plaintiff alleges that Captains Boden and Vasaturo deliberately ignored Lanzatella's or Farinha's March 3, 2006 request to move Plaintiff. The Weinstein deposition provides the chief support for this allegation. (Weinstein Dep. Tr. at 16:10–17:6.) Undoubtedly, such an allegation would be sufficient to state a claim for relief against Boden and Vasaturo individually, if they were defendants in this action. *See Heisler v. Kralik,* 981 F.Supp. 830, 837–38 (S.D.N.Y.1997). Because Boden and Vasaturo are not defendants, however, Plaintiff must succeed in demonstrating that they are municipal policymakers on the subject of protecting inmates. *See Chin v. N.Y. City Nous. Auth.,* 575 F.Supp.2d 554, 561–62 (S.D.N.Y.2008).

Although *Monell* liability may attach for the decisions of final policymakers, "[t]he fact that a particular official —even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur,* 475 U.S. at 481. Rather, a deliberate choice must be made "from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483. Whether or not an official is a "policy-making official" for purposes of imposing *Monell* liability is a question of state law determined by the Court. *See Jett*

*v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Plaintiff bears the burden of showing that Boden and Vasaturo are officials with final policymaking authority. *See Jeffes v. Barnes,* 208 F.3d 49, 57–58 (2d Cir.2000).

Plaintiff has failed to demonstrate that either Boden or Vasaturo make final policy decisions for the City with respect to the protection or housing of inmates. The only reference to them in the record is Lanzatella's statement that they were "in charge" of "security" and "prisoner movement," respectively. (Lanzatella Dep. Tr. at 102:14–15, 103:2–3.) Plaintiff did not, however, interview or depose any prison officials, including Boden and Vasaturo, or produce any discovery relating to the role of Boden and Vasaturo at Riker's. Plaintiff has produced no evidence as to what authority each had, what guidelines and policies they were subject to, and what oversight was in place. Accordingly, the Court cannot allow this claim to go forward on a theory that either Captain Vasaturo or Boden had final policymaking authority. *See, e.g., Cruz v. Liberatore,* 582 F.Supp.2d 508, 521 (S.D.N.Y.2008) (granting summary judgment where plaintiff failed to provide "any documentary evidence or testimony suggesting that" the named official was the defendant municipality's final policymaker); *Springle v. Metro. Transp. Auth.,* No. 06 Civ. 734(GEL), 2008 WL 331362, at \*7 (S.D.N.Y. Feb.1, 2008).

#### b. Deliberate Indifference to a Widespread Practice

To the extent that Plaintiff argues that the City was aware of similar constitutional violations but failed to do anything to end the practice, Plaintiff has failed to adduce any evidence of widespread constitutional violations by DOC personnel.

**\*7** Plaintiff argues that a lawsuit by another prison inmate in this District, *Shuford v. City of N.Y.,* No. 09 Civ. 945(PKC), as well as a recent article in the *New York Times,* provide ample evidence of a policy or practice of the DOC. (*See* Pl.'s Mem. 6–7; Marcus Decl. Exs. G, H.) Neither of these documents, however, is admissible evidence. [5] Although this Court can take judicial notice of filings in other courts, it can do so only to acknowledge the existence of the lawsuit or filing, not for the truth of matters asserted in those claims. *See Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d

Cir.1991); *see also Boyd v. City of Oakland,* 458 F.Supp.2d 1015, 1047–48 (N.D.Cal.2006) (declining to take notice of similar lawsuits to establish policy or practice for purposes of *Monell* claim). Newspaper articles are hearsay when introduced to prove the truth of the matter asserted, and also must not be admitted. *See Griffin v. City of N.Y.,* 287 F.Supp.2d 392, 395 n. 8 (S.D.N.Y.2003); *McAllister v. N.Y. City Police Dep't,* 49 F.Supp.2d 688, 706 n. 12 (S.D.N.Y.1999) ("Newspaper articles are hearsay, however, and therefore are not admissible evidence of New York City Police Department policy or custom.").

Similarly, Plaintiff's Rule 56.1 statement cites no evidence, admissible or otherwise, that the DOC ever denied Plaintiff medical care at any time other than on March 9, 2006, when Plaintiff alleges that his "requests for medical care and attention were ignored, and [P]laintiff was told by the corrections officers that if he sought medical care or informed anyone of his requests for care he would receive an infraction and/or be placed in solitary confinement." (Pl.'s 56.1 ¶ 20.) Such a single isolated incident, especially one involving only low-level or non-policymaking employees, is insufficient to support a *Monell* claim. *See Ricciuti v. N.Y. City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991).

c. Failure To Train, Supervise, and Discipline

To succeed on a theory of liability based on either failure-to-train or failure-to-supervise, a plaintiff must make three showings.

> First, to reach the jury, the plaintiff must offer evidence from which a reasonable jury could conclude that a policy-maker knows to a moral certainty that her employees will confront a given situation. Next, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees [sic] mishandling the situation. Finally, the plaintiff must show that the wrong choice by the city employee

will frequently cause the deprivation of a citizen's constitutional rights.

*Green v. City of N.Y.,* 465 F.3d 65, 80 (2d Cir.2006) (quotations and citations omitted); *accord Walker v. City of N. Y.,* 974 F.2d 293, 297–98 (2d Cir.1992).

Additionally, to survive summary judgment on a failure-to-train claim, a plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Amnesty Am.,* 361 F.3d at 129; *accord Jenkins v. City of N.Y.,* 478 F.3d 76, 94 (2d Cir.2007); *Amensty Am.,* 361 F.3d at 127 n. 8 ("[A] failure to train claim also requires evidence as to the city's training program and the way in which that program contributed to the violation."). In this case, Plaintiff has failed to conduct any discovery as to the training that prison officials undergo regarding the housing of cooperating witnesses, the provision of medical care or—for that matter—any training at the DOC in general.

**\*8** To succeed on a failure-to-supervise claim, Plaintiff "must establish [Defendant's] deliberate indifference by showing that 'the need for more or better supervision to protect against constitutional violations was obvious,' " but that the municipality "made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct.' " *Amnesty Am.,* 361 F.3d at 127 (quoting *Vann v. City of N. Y.,* 72 F.3d 1040, 1049 (2d Cir.1995)). Plaintiff has failed to adduce any evidence of a causal connection between the supervision received by unnamed prison employees and the alleged failure to transfer or segregate Plaintiff or provide him with medical care on March 9, 2006. In fact, the only evidence in the record about DOC procedure is the DOC Directive entitled Restrictive Housing Due Process and its replacement, Close Custody Housing. (*See* Decl. of Harry Ahl Ex. C.) Neither references how employees are supervised. Accordingly, there is no evidence in the record that could support a claim that the City's supervision over prison employees was insufficient.

Finally, Plaintiff has failed to put forth any evidence that the City or DOC failed to adequately discipline its personnel. The record is completely silent with respect to how the DOC responded to complaints against its personnel.

Because Plaintiff has offered no admissible evidence that will support a *Monell* claim for failure to train, supervise, or discipline, the City is entitled to summary judgment.

### D. Municipal Liability for Lanzatella

Plaintiff likewise seeks to hold the City liable for Lanzatella's alleged failure to take steps to ensure his safety. Plaintiff has produced no evidence that the City failed to adequately train, supervise, or discipline Lanzatella. Accordingly, Plaintiff can only succeed if Lanzatella herself is "responsible for establishing final government policy." *Pembaur,* 475 U.S. at 482; *accord Gronowski v. Spencer,* 424 F.3d 285, 298 (citing *Pembaur* ) (2d Cir.2005) ( "Even one episode of [unconstitutional conduct] may establish municipal liability under § 1983 if ordered by a person whose edicts or acts represent official city policy."). Because Lanzatella is not a final policymaker, however, the City is entitled to summary judgment on this claim as well.

*Section 177–c of the New York Judiciary Law* provides authority for the district attorneys of the counties comprising large New York cities to create a plan for a special narcotics prosecuting unit. *See* N.Y. Judiciary Law § 177–c. The SNPO is one of these units and it was created by agreement among the district attorneys of the five counties that make up New York City. (*See* Decl. of Kristine Hamann (Hamann Decl.) Ex. E.) The plan calls for the appointment of one Special Assistant District Attorney, who "[u]nder the policy direction of the five District Attorneys" will "formulate policies, procedures and standards for the prosecution of cases" in that unit. (*Id.* at 3.) That Special Assistant District Attorney is Bridget Brennan. (*See* Defs.' 56.1 ¶ 29.) In addition to Brennan, an Executive Staff supervises the different bureaus and units within the SNPO. (*Id.* ¶¶ 30–31.) The Narcotics Gang Unit is one of these subunits. (*Id.*)

**\*9** Lanzatella is an ADA in the SNPO and the chief of the Narcotics Gang Unit. (Defs.' 56.1 ¶ 7.) Her duties are limited to "supervising the lawyers and staff people in the Narcotics Gang Unit, interacting with detectives, going to court and handling cases in court, interviewing witnesses, and motion and grand jury practice ." (*Id.* ¶ 26.) At the time of the events that gave rise to Plaintiff's claim, Lanzatella supervised only one other attorney, Farinha. (*Id.* ¶ 25.)

Based on New York state law and the uncontroverted evidence in the record regarding the structure of the SNPO, Lanzatella cannot be said to have final responsibility for establishing governmental policy with respect to the handling of cooperating witnesses or ensuring inmate safety. *See Peterson v. Tomaselli,* 469 F.Supp.2d 146, 169–70 (S.D.N.Y.2007) (concluding that unit chief in same office was not a final policymaker), Plaintiff has adduced no evidence or legal authority indicating otherwise.

Accordingly, the City is entitled to summary judgment on Plaintiff's *Monell* claim for Lanzatella's conduct.

### E. Individual Claims Against Lanzatella

Plaintiff also asserts claims against Lanzatella in her individual capacity. Lanzatella argues that all claims brought against her must be dismissed under the doctrines of absolute or qualified immunity.

#### 1. Absolute Immunity

Prosecutors have absolute immunity for claims for damages arising out of duties that "are intimately associated with the judicial phase of the criminal prosecution." *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Actions are not, however, immune simply because they are performed by a prosecutor. *See Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209. 273 (1993). "[W]hen a prosecutor performs an investigative or administrative function"—functions not accorded immunity at common law—"absolute immunity is not available." *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987). To determine whether absolute or qualified immunity attaches to particular conduct, courts apply a functional approach. *See Cornejo v. Bell,* 592 F.3d 121, 126 (2d Cir.2010) ("The real distinction between whether an executive employee is entitled to absolute or qualified immunity turns on the kind of function the employee is fulfilling in performing the acts complained of."). When asserting absolute immunity, the official claiming the privilege "shoulders the burden of establishing the existence of immunity for the function in question." *Hill v. City of N.Y.,* 45 F.3d 653, 660 (2d Cir.1995).

Prosecutors are entitled to absolute immunity only for "conduct 'intimately associated with the judicial phase of the criminal process,' " *Hill,* 45 F.3d at 661 (quoting *Imbler,* 424 U.S. at 430), including the initiation of prosecutions, the presentation of evidence at trial, preparatory functions such as evaluating and organizing evidence and presenting it to a grand jury, and the decision of which criminal charges to bring, *id.* Put another way, those functions a prosecutor carries out not as an advocate, but as an investigator and administrator, are not accorded absolute immunity. *See Buckley,* 509 U.S. at 273–274 ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.' " (quoting *Hampton v. Chicago,* 484 F.2d 602, 608 (7th Cir.1973))).

**\*10** This is not to say that the functional approach draws a bright line between in-the-courtroom and out-of-the-courtroom tasks. As the Supreme Court stated in *Buckley,*

> [w]e have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

*Buckley,* 509 U.S. at 273.

The Second Circuit has twice considered what immunities attach to a prosecutor's dealings with a cooperating witness. First, in *Barbera v. Smith,* the estate of a murdered cooperating witness brought suit against an Assistant United States Attorney for negligently disclosing the witness's cooperation and for denying the witness's requests for protection. *See Barbera,* 836 F.2d at 98–99. In rejecting absolute immunity, the court characterized the prosecutor's activity as the "supervision of and interaction with law enforcement agencies in acquiring evidence which might be used in prosecution." *Id.* at 100. The *Barbera* court noted that, at the time the cooperating witness was put at risk and killed, "the government was still seeking evidence, including testimony from witnesses such as Barbera, that would enable it to prosecute" the targets of the investigation. *Id.* at 101. The *Barbera* decision did "not foreclose the possibility in an appropriate case" of absolute immunity for such a claim; it merely concluded that on the facts before the court, the prosecutor's "activities at the time of the alleged conduct ... seem[ed] to have involved primarily" investigative functions. *Id.*

Similarly, in *Ying Jing Gan v. City of New York,* the Second Circuit found that a prosecutor's failure to protect a witness was "not integral either to a decision of whether or not to institute a prosecution or to the conduct of judicial proceedings." 996 F.2d 522, 531 (2d Cir.1993). Although the investigation was, as in *Barbera,* in its preliminary stages at the time of the witness's death, the Circuit held that the plaintiff complained of "conduct that plainly is not integral to a decision of whether or not to institute a prosecution or to the conduct of judicial proceedings," and accordingly found that it was not entitled to the protection of absolute immunity. *Id.*

As in *Barbera* and *Gan,* the record reveals that the primary role of Plaintiff's cooperation was to develop evidence, both for the prosecution of Plaintiff's co-defendants and for new prosecutions. "Lanzatella was debriefing ... Delrosario to determine whether or not he had information about other potential criminal activity. That investigation eventually led to another prosecution." (Farinha Dep. Tr. at 14:5–13.) Although Lanzatella testified that her interviews of Plaintiff were intended "to obtain information about the defendants he was arrested with and their criminal activities *and others,*" (Lanzatella Dep. Tr. at 71:13–16 (emphasis added)), she also testified that a primary purpose of Plaintiff's cooperation was to "develop additional cases about others and additional crimes" (*id.* 72:17–20). In fact, most of the cooperation sessions that Lanzatella "sat in on had to do with other people that [Delrosario] knew that were involved in criminal activity." (*Id.* 73:3–6.) Similarly, Farinha testified at his deposition that "Lanzatella is primarily responsible for conducting investigations." (Farinha Dep. Tr. at 13:9–13.) Because Lanzatella's primary purpose in signing Delrosario up

as a cooperator was investigating criminal activity, both Plaintiff's own and that of others, rather than "a decision with regard to whether or not to institute a prosecution" or the "performance of [her] litigation-related duties," *Gan, 996 F.2d at 530,* her conduct is not shielded by the doctrine of absolute immunity.

### 2. Qualified Immunity

**\*11** " 'The doctrine of qualified immunity shields government employees acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their conduct violated clearly established rights of which an objectively reasonable official would have known.' " *Peterson v. Tomaselli,* No. 02 Civ. 6325(DC), 2003 WL 22213125, at *5 (S.D.N.Y. Sept.29, 2003) (quoting *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568–69 (2d Cir.1996)). "Even when a plaintiff's federal rights are well-defined, a defendant may successfully claim qualified immunity 'if it was objectively reasonable for the public official to believe that his acts did not violate those rights.' " *Id.* (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991)). When an official asserts the privilege of qualified immunity, a Court should uphold that immunity "unless the 'contours of the right' were 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Gan,* 996 F.2d at 531 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

"As a general matter, a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Gan,* 996 F.2d at 533 (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)); *accord Matican v. City of N.Y.,* 524 F.3d 151, 155 (2d Cir.2008). The Supreme Court has, however, recognized two exceptions to this broad principle. First, "the state or its agents may owe a constitutional obligation to the victim of private violence if the state had a 'special relationship' with the victim." *Matican,* 524 F.3d at 155. "Second, the state may owe such an obligation if its agents in some way had assisted in creating or increasing the danger to the victim." *Matican,* 524 F.3d at 155 (quotations and citations omitted).

The *DeShaney* line of cases recognizes that "when the State takes a person into its custody and holds him

there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney,* 489 U.S. at 199–200 (citing *Youngberg v. Romeo,* 457 U.S. 307, 317, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)); *accord Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("The [Eighth] Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–527, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). Accordingly, courts have found that liability can be imposed on prison officials where a prisoner faces an objectively serious risk of harm and the prison official acts with deliberate indifference towards the inmate's safety. *See Farmer,* 511 U.S. at 834.

At least with respect to non-custodial cooperating witnesses, however, the Second Circuit has made clear that no special relationship exists such that a prosecutor is responsible for the safety of a witness. *See Gan,* 996 F.2d at 535; *Barbera,* 836 F.2d at 102. This case thus present the question of whether Plaintiffs incarceration imposed upon Lanzatella a "clearly established" duty to take affirmative steps to ensure his safety like the one imposed upon prison officials in *Farmer.* A constitutional right is clearly established where "(1) the law is defined with reasonable clarity (2) the Supreme Court or the Second Circuit has recognized the right; and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Reuland v. Hynes,* 460 F.3d 409, 420 (2d Cir.2006) (citation omitted).

**\*12** In this case, Plaintiff has cited no authority, and this Court can find none, that requires prosecutors to step into the shoes of prison officials and safeguard prisoners. *Cf. Newman v. Gonzalez,* 05 Civ. 5215(LB), 2007 WL 674698, *2 (E.D.N.Y. Mar. 5, 2007) ("[*Barbera* ] held that a prosecutor was entitled to qualified immunity because there was no clearly established duty to protect the witness at the time of his death. *No right has since been established."* (omissions and internal citations omitted; emphasis added)). While cognizant of the special relationship that exists between prison officials and inmates, *see Morales v. N.Y. State Dep't of Corrections,* 842 F.3d 27, 30 (2d Cir.1998), that relationship has not been extended to reach other state actors.

As recently as 2000, a court in this District addressed a nearly identical set of facts and found that no clearly established legal duty existed. In *Johnson v. City of New York,* the plaintiff sued the City and its officials for failing to protect him from attacks by fellow inmates against whom he had agreed to testify. *See Johnson v. City of N.Y.,* No. 00 Civ. 3626(SHS), 2000 WL 1335865, at *1 (S.D.N.Y. Sept.15, 2000). Despite allegations that an assistant district attorney had assured the plaintiff that he would be protected from fellow inmates, Judge Stein concluded that "it cannot be said that it was clearly established that [the assistant district attorney] had created or assumed a special relationship with [plaintiff] imbuing him with a constitutional duty to protect him." *Id.* at *4.

Based on the lack of case law establishing a duty of prosecutors to protect inmates from the violence of other inmates, the Court finds that Lanzataella did not have a clearly established duty to protect Plaintiff. Accordingly, she is protected from these allegations by qualified immunity.

### III. CONCLUSION

For the foregoing reasons, Defendants City of New York and Lanzatella's motion for summary judgment is granted in its entirety, The claims against the John Doe Defendants are dismissed without prejudice. The Clerk of the Court is respectfully directed to terminate the motion docketed as Doc. No. 84, to enter judgment accordingly, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 882990

Footnotes

1    Lanzatella disputes that she was informed of such threats prior to the March 9, 2006 incident. (*See* Defs.' Reply 56.1 ¶ 8.)

2    Defendants object to Weinstein's testimony on this point on hearsay grounds. Defendants object to Elias's report on the grounds that no foundation has been laid for the expert report. Because this evidence does not change the outcome, the Court need not resolve the objection.

3    Defendants also object to this testimony on hearsay grounds because Weinstein was not sure whether or not he was there himself. Because this evidence does not alter the outcome of Defendants' motion, the Court need not resolve the objection.

4    The intended recipient of the letter is unclear. While the inside address contains the name of Captain Vasatoro, the greeting is addressed to Captain Boden. (Decl. of Mark D. Zuckerman (Zuckerman Decl.) Ex. F.)

5    It is true that in considering a deliberate indifference claim, including claims for failure to supervise or discipline, a Court may consider complaints made against a municipality *and its response to them to* determine whether the municipality acted with deliberate indifference. *See Fiacco v. City of Rensselaer,* 783 F.2d 319, 327–28 (2d Cir.1986). Plaintiff, however, simply cites to allegations of misconduct to support the proposition that the conduct occurred, or, in the alternative, cites to the allegations of misconduct without investigating how the City responded. Neither supports an inference of deliberate indifference.

**End of Document**      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5437617
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David DOUGLAS, Sr., Plaintiff,
v.
PERRARA, Corr. Officer, Great Meadow
C.F.; Lawrence, Corr. Officer, Great
Meadow C.F.; Whittier, Corr. Officer, Great
Meadow C.F.; Mulligan, Corr. Officer,
Great Meadow C.F.; Deluca, Corr. Sergeant,
Great Meadow C.F.; and Russel, Deputy
Superintendent, Great Meadow C.F, Defendants.

No. 9:11–CV–1353 (GTS/RFT).
|
Sept. 27, 2013.

**Attorneys and Law Firms**

David Douglas, Sr., Liverpool, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Colleen D. Galligan, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this *pro se* civil rights
action filed by David Douglas, Sr., ("Plaintiff") against
the six above-captioned New York State correctional
employees, are the following: (1) Defendants' motion
for partial summary judgment (requesting the dismissal
of Plaintiff's claims against Defendant Russell, and
his claims against the remaining Defendants in their
official capacities); and (2) United States Magistrate
Judge Randolph F. Treece's Report–Recommendation
recommending that Defendants' motion be granted.
(Dkt.Nos.70, 80.) Neither party filed an objection to
the Report–Recommendation, and the deadline by which
to do so has expired. (*See generally* Docket Sheet.)
After carefully reviewing the relevant filings in this
action, the Court can find no clear error in the Report–
Recommendation: Magistrate Judge Treece employed
the proper standards, accurately recited the facts, and

reasonably applied the law to those facts. As a result, the
Court accepts and adopts the Report–Recommendation
for the reasons stated therein. (Dkt. No. 80.)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Treece's Report–
Recommendation (Dkt. No. 80) is ***ACCEPTED*** and
***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for partial summary
judgment (Dkt. No. 70) is ***GRANTED;*** and it is further

**ORDERED** that the following claims are ***DISMISSED***
from this action: (a) all claims asserted against Defendant
Russell, and (b) all claims asserted against Defendants
in their official capacities only. The Clerk is directed to
terminate Defendant Russell from this action; and it is
further

**ORDERED** that the following claims ***REMAIN
PENDING*** in this action: (a) Plaintiff's claim that
Defendants Whittier, Mulligan, Perrara and/or Lawrence
subjected him to inadequate prison conditions by
depriving him of meals for approximately five consecutive
days in December 2009, in violation of the Eighth
Amendment; (b) Plaintiff's claim that Defendants
Whittier, Mulligan, Perrara and Lawrence used excessive
force against him, and that Defendant Deluca failed
to protect him from the use of that excessive force, in
violation of the Eighth Amendment and New York State
common law; and (c) Plaintiff's claim that Defendant
Deluca was deliberately indifferent to Plaintiff's serious
medical needs (following the assaults) in violation of the
Eighth Amendment; and it is further

**ORDERED** that Pro Bono Counsel be appointed for the
Plaintiff for purposes of trial only; any appeal shall remain
the responsibility of the plaintiff alone unless a motion for
appointment of counsel for an appeal is granted; and it is
further

**ORDERED** that upon assignment of Pro Bono Counsel,
a final pretrial conference with counsel will be scheduled
in this action before the undersigned, at which time the
Court will schedule a jury trial for Plaintiff's remaining
claims as set forth above against Defendants Whittier,
Mulligan, Perrara, Lawrence and DeLuca. Counsel are

directed to appear at the final pretrial conference with settlement authority from the parties.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*2** *Pro se* Plaintiff David Douglas brought a civil rights Complaint, pursuant to 42 U.S.C. § 1983, asserting that Defendants violated his constitutional rights while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and housed in the Great Meadow Correctional Facility. Specifically, Plaintiff alleges that in early December 2009, he wrote a letter to Defendant Eileen Russell[1] complaining that he had been denied meals for several days. *See* Dkt. No. 1, Compl. at ¶¶ 8, 64, & 66. Plaintiff further alleges that the remaining Defendants violated his constitutional rights when they used excessive force against him on several occasions and denied him medical care in order to treat the injuries he sustained therewith. *See generally id.* And, according to Plaintiff, Defendant Russell's failure to take disciplinary action against these individuals and curtail their "known pattern of physical abuse of inmates" renders her liable for violating his constitutional rights. *Id.* at ¶ 66.

Presently pending is Defendants' Motion for Partial Summary Judgment whereby they seek dismissal of Defendant Russell from this action as well as dismissal of all claims against the remaining Defendants in their official capacities. Dkt. No. 70. A response to that Motion was due on February 22, 2013. To date, the Court has not received a response from Plaintiff.

### I. DISCUSSION

#### A. Standard of Review

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with

[ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173

(2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991).* Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).*

Pursuant to the Local Rules of Practice for the Northern District of New York, "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." N.D.N.Y.L.R. 7.1(b)(3). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz, 76 F.3d 483, 486 (2d Cir.1996).* Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.; FED. R. CIV. P. 56(c).* Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 70–2), supplemented by Plaintiffs' verified Complaint (Dkt. No. 1), as true. *See Lopez v. Reynolds, 998 F.Supp. 252, 256 (W.D.N.Y.1997).*

**B. Personal Involvement**

As noted above, Plaintiff brings this civil rights action for alleged violations of his constitutional rights during his incarceration in December 2009 at Great Meadow Correctional Facility. Plaintiff claims that in early December 2009, he was subjected to threats and harassment by other inmates and correctional officers. Compl. at ¶ 1. Plaintiff alleges that beginning on December 11, 2009, he was denied several meals for several consecutive days by unnamed individuals, prompting him to file grievances and write two letters to Defendant Russell. *Id.* at ¶¶ 2–8. [2] Thereafter, on December 16, 2009, Plaintiff's meals were delivered to him and, on the following date, he was moved to protective custody. *Id.* at ¶¶ 9–10. The remainder of Plaintiff's Complaint describes a series of events wherein the remaining Defendants are accused of using excessive physical force against him and denying him medical attention.

**\*4** With regard to the pending, unopposed Motion, the Court notes that there is a paucity of factual allegations contained in the Complaint concerning Defendant Russell. In fact, the only factual allegation that this Court can point to is that Plaintiff wrote two letters to Defendant Russell complaining about being denied meals. Defendant Russell is not named nor referenced throughout the remainder of the Complaint. Nevertheless, in the section of the Complaint where Plaintiff lists his causes of action, he seemingly seeks to hold Defendant Russell liable for her alleged failure to intervene and take disciplinary action against the Defendants in order to curb their known pattern of physical abuse against inmates. *Id.* at ¶¶ 64 & 66.

According to Defendants' uncontroverted submissions, Defendant Eileen Russell is employed by DOCCS and worked at Great Meadow in 2006 as the Assistant Deputy Superintendent for Special Housing assigned to the Behavioral Health Unit. Dkt. No. 70–3, Eileen Russell Decl., dated Feb. 4, 2013, at ¶¶ 1, 3, & 4. During her tenure in that position, Plaintiff neither worked nor was housed as a patient in the Behavioral Health Unit. Russell Decl. at ¶ 11. Russell did not have any responsibilities related to delivery of meals to inmates nor does she have any recollection of speaking with Plaintiff or seeing any correspondence from him. *Id.* at ¶ 13. Furthermore, at no time was she made aware of any assault against Plaintiff by any DOCCS employee. *Id.* at ¶ 15.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994)* (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz, 1997 WL 576038, at \*2 (S.D.N.Y. Sept. 15, 1997)* (citing *Colon v. Coughlin, 58 F.3d 865, 874 (2d Cir.1995) & Wright v. Smith, 21 F.3d at 501)* (further citations omitted)). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).*

It appears that Plaintiff seeks to hold Defendant Russell liable due to her employment as a supervisor at Great Meadow. The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if she: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. [3] *Colon v. Coughlin,* 58 F.3d at 873 (citations omitted); *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted).

**\*5** Here, the evidence shows that Defendant Russell did not directly participate in any constitutional wrongdoing, she was not aware that Plaintiff had been experiencing any problems with other inmates and staff, in her assignment to the Behavioral Health Unit she did not come into contact with the Plaintiff, and, she was not responsible for creating policies or customs nor for rectifying any of the alleged constitutional infirmities Plaintiff is alleged to have been subjected to. Because Plaintiff failed to respond to Defendants' Motion, he has not created any material issue of fact regarding Russell's non-involvement in any constitutional wrongdoing. Thus, based upon the record before the Court, we find that Defendant Russell was not personally involved in any wrongdoing and should be **dismissed** from this action. *See Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

### C. Eleventh Amendment

By their Motion, Defendants seek dismissal of claims brought against them in their official capacities. Dkt. No. 70. In making this request, the Defendants note that during the pendency of this action, Plaintiff was released from DOCCS's custody, thereby rendering moot any request he has made for injunctive relief. Dkt. No. 70–4, Defs.' Mem. of Law, at pp. 7–8. After reviewing the Complaint, the Court notes that Plaintiff primarily seeks monetary compensation for both compensatory and punitive damages. *See* Compl. at Relief Requested. In

addition, he seeks a declaratory judgment that his rights have been violated, but does not seek other injunctive relief. *Id.*

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 98–101; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.,* 915 F.Supp. 525, 539 (N.D.N.Y.1995) (citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

**\*6** However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends also upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young,* 209 U.S. 123 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.,* 915 F.Supp. at 540. While much of the relief sought herein is compensatory

and punitive monetary relief, to the extent Plaintiff seeks some form of declaratory relief, such claims against the Defendants in their official capacities could go forward insofar as the Plaintiff seeks prospective relief. However, in light of his release from DOCCS's custody, the Court finds that any request for prospective injunctive relief is moot and the claims against the remaining Defendants in their official capacities should be **dismissed.** *Khalil v. Laird,* 353 F. App'x 620 (2d Cir.2009) (citing *Muhammad v. City of New York Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997)).

## II. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Partial Summary Judgment (Dkt. No. 70) be **GRANTED** and all claims against Defendant Russell be **DISMISSED** and claims against the remaining Defendants in their official capacities be **DISMISSED;** and it is further

**RECOMMENDED,** that if the above recommendations are accepted, this case be set down for a final pre-trial conference with the parties to assess whether this matter is trial ready; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5437617

Footnotes

1   Although Plaintiff spells this Defendant's name as "Russel," it is clear from Defendants' submissions that the correct spelling of this individual's name is "Russell" and the Court will refer to her accordingly. Compl. at ¶ 8; Dkt. Nos. 10 & 70–3.

2   Plaintiff alleges that in addition to filing several grievances he submitted sick call requests and sent letters to the Inspector General, all explaining how his Eighth Amendment rights were being violated. Compl. at ¶¶ 5–8.

3   The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), upon the categories of supervisory liability under *Colon v. Coughlin,* 58 F.3d 865 (2d Cir.1995). *See Grullon v. City of NewHaven,* 720 F.3d 133 (2d Cir.2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.,* 2009 WL1835939, at \*6 (S.D.N.Y. June 26, 2009), *aff'd,* 387 F. App'x 55 (2d Cir.2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five-factor *Colon* test.

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5372872
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Aldo Contreras LIBERATI, Plaintiff,

v.

GRAVELLE, Sgt., Clinton County Jail, Defendant.

No. 9:12–CV–00795 (MAD/DEP).
|
Sept. 24, 2013.

**Attorneys and Law Firms**

Aldo Contreras Liberati, Philipsburg, PA, pro se.

Lemire, Johnson Law Firm, Gregg T. johnson, Esq, Mary E. Kissane, Esq, of Counsel, Malta, NY, for Defendant.

**ORDER**

MAE A. D'AGOSTINO, District Judge.

**\*1** On May 14, 2012, Plaintiff commenced this civil rights action pursuant to 42 U.S.C. § 1983, alleging that upon arrival at Clinton County Correctional Facility, Defendant used excessive force against Plaintiff, causing him injury. *See* Dkt. No. 1. On December 28, 2012, Defendant moved for summary judgment seeking dismissal of Plaintiff's claim pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Dkt. No. 22–7 at 5. Defendant argues that dismissal is appropriate based on (1) plaintiff's failure to exhaust the available administrative remedies at Clinton before commencing suit; (2) the record evidence, from which no reasonable factfinder could conclude that he used force that violated Plaintiff's constitutional rights; and (3) his entitlement to qualified immunity from suit. *See generally* Dkt. No. 22–7. Plaintiff failed to oppose Defendant's motion for summary judgment. *See* Dkt. No. 31 at 6.

In a Report–Recommendation and Order dated August 9, 2013, Magistrate Judge Peebles recommended that the Court grant Defendant's motion for summary judgment and dismiss Plaintiff's complaint. *See* Dkt. No. 31 at 2. Specifically, although Magistrate Judge Peebles found that questions of fact preclude granting the motion on exhaustion grounds, he found that the motion should be granted on the merits because no reasonable factfinder could conclude that Defendant violated Plaintiff's Eighth Amendment rights. *See* id. at 21. Neither party objected to Magistrate Judge Peebles Report–Recommendation and Order.

On February 5, 2012, Plaintiff was transferred to Clinton Correctional Facility ("Clinton") located in Dannemora, New York. *See* Dkt. No. 22–2 at 3. During the transfer, the corrections officers escorting Plaintiff called Clinton to notify them that Plaintiff was difficult and combative. *See id.* Upon arrival, the staff at Clinton prepared Plaintiff for housing by performing the routine intake and booking procedures. See id. at 4. Part of the normal procedure was to conduct a patdown search to detect any contraband that was not detected by the "BOSS" chair. *See id.* at 3. During the pat-down, Plaintiff disobeyed orders on at least two occasions when he refused to face and keep his hands on the wall. See id. at 4.

When the Clinton officers realized that Plaintiff had a second layer of pants underneath his jeans, they instructed him to remove them in a private changeout room. See id. at 4. After removal of the pants Plaintiff refused to remain on the wall, so they attempted to physically restrain him. See id. at 5. Upon hearing this commotion, Defendant entered the changeout room to assist with the situation. See id. He observed Plaintiff resisting the officers that were trying to restrain him. See id. Defendant administered "a single, one second, application of O.C. spray towards other officers to continue to gain control over Plaintiff and secure his hands." *Id* . After he administered the spray, Defendant placed it back in his holster and retreated to allow the other officers to gain control of Plaintiff. See id. Although Defendant remained in the room, he used no further force against him other than to place his feet near the Plaintiff to prevent him from putting his hands under his body. See id. at 5–6. When the Plaintiff was fully secured, Defendant left the room. See id. at 6. Plaintiff was then escorted to a holding cell to provide him an opportunity to calm down, decontaminate his eyes with eye wash and see medical staff at the facility. See id.

**\*2** Plaintiff's verified complaint alleges that Defendant punched him in the head twice and that he did not file a grievance regarding these allegations because the corrections officers at Clinton refused to provide him with the necessary form. See id. at 2.

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Morever, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' *"Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. See id. at 295 (citing *Showers v. Eastmond,* No. 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidenced" is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

**\*3** Upon review of Magistrate Judge Peebles' Report–Recommendation and Order, the Court finds that the report correctly determined that Defendant's motion for summary judgment should be granted. In support of the motion for summary judgment, Defendant argues that he did not violate Plaintiff's Eighth Amendment rights because there is no record evidence that he punched Plaintiff in the head or used excessive force. *See* Dkt. No. 22–7 at 8–11. To state a claim for excessive force, a plaintiff must show defendant's acts are "incompatible with 'the evolving standards of decency that mark the process of a maturing society,' or involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958); *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). Even though the Eighth Amendment does not mandate that prisons be comfortable, they must be sufficiently humane. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two component—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson v. McMillian,* 503 U.S. 1, 7–8 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). The

subjective element is satisfied when plaintiff demonstrates that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the alleged conduct." *Wright,* 554 F.3d at 268 (internal quotation marks omitted). This inquiry looks at "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson,* 503 U.S. at 6 (quoting *Whitley v. Albers,* 475 U.S. 312, 320 (1986)).

The objective element examines the harm inflicted in relation to "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8). Malicious or sadistic harm caused by prison officials, notwithstanding the extent of injury, always violates the "contemporary standards of decency." *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9). The amount of force is examined in proportion to the need reasonably perceived by prison officials and what, if anything, did they do to limit such force. *See Hudson,* 503 U.S. at 7; *Whitley,* 475 U.S. at 321; *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993).

In the present matter, no evidence in the record suggests that Defendant, Gravelle used force maliciously or sadistically against Plaintiff. The record reveals that action was initiated against Plaintiff in response to his repeated failures to obey orders to keep his hands on the wall during the pat-down search. Defendant administered a single O.C. spray to assist the corrections officers and then moved away from Plaintiff, using no more force or spray than was necessary to control Plaintiff. The undisputed material facts make clear that no reasonable factfinder could conclude that Defendant used malicious or sadistic force against Plaintiff because such actions were taken in response to Plaintiff's failure to obey orders and the need to restore order. Although Plaintiff's claim that Defendant punched him in the head would constitute malicious or sadistic force in violation of Plaintiff's Eighth Amendment rights, there is no evidence in the record to support such claim. Therefore, Plaintiff fails to state a claim that Defendant violated his Eighth Amendment rights.

**\*4** After careful review of Magistrate Judge Peebles' Report–Recommendation and Order, the parties' parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles' August 9, 2013 Report–Recommendation and Order is **ADOPTED in its entirety;** and the Court further

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 22) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Aldo Conteras Liberati has commenced this action pursuant to 42 U.S.C. § 1983, alleging the deprivation of his rights under the United States Constitution. In his complaint, plaintiff alleges that, upon his arrival at the Clinton County Correctional Facility ("Clinton"), he suffered injuries arising from the use of excessive force by defendant Gravelle, a sergeant corrections officer stationed at Clinton at the times relevant to this action.

Currently pending before the court is defendant's motion for summary judgment on the merits, and based also on plaintiff's failure to exhaust the available administrative remedies and defendant's assertion that he is entitled to qualified immunity from suit. For the reasons set forth below, I recommend that defendant's motion be granted, and plaintiff's complaint be dismissed.

I. *BACKGROUND* [1]
On February 5, 2012, plaintiff was transported to Clinton, located in Dannemora, New York, by United States immigration officers. Gravelle Decl. (Dkt. No. 22–2) at ¶ 8. Prior to his arrival at Clinton, immigration officers called Clinton to notify staff that, during the transport,

plaintiff was difficult and combative. *Id.* Upon arriving at Clinton, facility staff began to prepare plaintiff for housing by subjecting him to routine intake and booking procedures. *Id.* at ¶ 10. This process included scanning plaintiff using a "BOSS" chair, which is designed to detect any metal contraband, as well as pat-searching him in a private room called the "changeout room" for any contraband not detected by the BOSS chair. [2] Id. at ¶¶ 3, 10.

During the pat-search, plaintiff was directed by Clinton corrections officers to face and keep his hands on the wall. Gravelle Decl. (Dkt. No. 22–2) at ¶ 11. On at least two occasions, however, plaintiff disobeyed this order, and turned toward the officer conducting the search. Gravelle Decl. Exh. A (traditionally filed) at 0:33, 1:05. At some point during the search, the officer performing the pat-down discovered that plaintiff was wearing a second layer of pants underneath his jeans. Gravelle Decl. (Dkt. No. 22–2) at ¶ 12. Plaintiff was then directed to move into a more private part of the changeout room and remove his jeans. *Id.* When plaintiff refused to remain on the wall after he removed his jeans, several Clinton corrections officers attempted to take physical control of the plaintiff to restrain him. *Id.;* Gravelle Decl. Exh. A (traditionally filed) at 1:11.

**\*5** Moments after the pat-search began, defendant Gravelle, whose office is located nearby the changeout room, heard the commotion arising from plaintiff's search, and went to assist the other officers. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13; Gravelle Decl. Exh. A (traditionally filed) at 1:15. Upon entering the changeout room, defendant observed plaintiff resisting the officers attempting to restrain plaintiff. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13. Defendant immediately administered one, single application of "O.C. spray" to regain control of plaintiff. [3] Gravelle Decl. (Dkt. No. 22–2) at ¶¶ 13, 14; Gravelle Decl. Exh. A (traditionally filed) at 1:17. Defendant then moved back away from Liberati and allowed the other corrections officers to secure plaintiff's hands. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13; Gravelle Decl. Exh. A (traditionally filed) at 1:18. Although defendant remained in the changeout room until plaintiff was secured, he did not use any further force against him. Gravelle Exh. A (traditionally filed) at 1:18–2:16. After plaintiff was secured, Clinton corrections officers escorted him to a holding cell to provide him opportunity to clam down, following which his eyes were decontaminated with

eye wash and he was seen by medical staff at the facility. Gravelle Dec. (Dkt. No. 22–2) at ¶ 15.

In plaintiff's verified complaint, he alleges that defendant punched him twice in the head. Compl. (Dkt. No. 1) at 8. He also contends that he did not file a grievance regarding these allegations due to the refusal of corrections officers at Clinton to provide him with the necessary form. *Id.* at 2.

## II. *PROCEDURAL HISTORY:*

Plaintiff commenced this action on May 14, 2012, by the filing of a complaint, motion to stay deportation, and application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1–3. Plaintiff's complaint is comprised of eight claims, and names six defendants, including defendant Gravelle. *See generally* Compl. (Dkt. No. 1). On August 27, 2012, District Judge Mae A. D'Agostino issued a decision and order granting plaintiff's request to proceed IFP, denying his motion to stay deportation, and dismissing all claims with the exception of plaintiff's Eighth Amendment excessive force cause of action asserted solely against defendant Gravelle. Dkt. No. 9.

Now that discovery in this matter is closed, the remaining defendant, Sergeant Gravelle, has moved for the entry of summary judgment, dismissing plaintiff's remaining claim, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Dkt. No. 22. Defendant argues that dismissal is appropriate based on (1) plaintiff's failure to exhaust the available administrative remedies at Clinton before commencing suit; (2) the record evidence, from which no reasonable factfinder could conclude that he used force that violated plaintiff's constitutional rights; and (3) his entitlement to qualified immunity from suit. *See generally* Def.'s Memo. of Law (Dkt. No. 22–7).

**\*6** Defendant's motion, which plaintiff has not opposed, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Plaintiff's Failure to Oppose Defendant's Motion*
The court's local rules require that a party seeking summary judgment must submit a statement of material

facts that it contends are undisputed by the record evidence. N.D.N.Y. L.R. 7.1(a)(3). The local rules also instruct the non-moving party to respond to the moving party's statement of material facts by specifically admitting or denying each of the facts listed in the moving party's statement. *Id.* The purpose underlying this rule is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment. *Anderson v. Dolgencorp of N.Y.,* Nos. 09–CV0360, 09–CV–0363, 2011 WL 1770301, at *1 n. 2 (N.D.N.Y. May 9, 2011) (Sharpe, J.).[4] To meaningfully fulfill this purpose, it is essential for the court to have the benefit of both the moving party's statement and an opposition statement from the non-moving party.

In this instance, defendant Gravelle has complied with local rule 7.1(a)(3), providing a statement setting forth twenty-three facts as to which, he contends, there is no genuine triable issue. Def.'s L.R. 7.1(a)(3) Statement (Dkt. No. 22–6). Plaintiff, however, has failed to respond either to that statement, or to defendant's motion generally.[5] See *generally* Docket Sheet.

By its terms, local rule 7.1 provides, in part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this provision in cases where a non-movant fails to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Svc. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a *pro se* litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, C.J.).

**\*7** Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's rule 7.1(a)(3) statement, Dkt. Nos. 22–1, 24–1, but has nonetheless failed to do so, I have construed defendant's facts contained therein as true to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendant's rule 7.1(a)(3) statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry,* 336 F.3d at 137.

B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only

in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also* Anderson, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Exhaustion of Available Administrative Remedies*
 **\*8** In his motion, defendant Gravelle argues that, because plaintiff did not file a grievance addressing the issues now raised in this action before commencing suit and pursue that grievance through the administrative grievance procedure available at Clinton, he is procedurally barred from pursuing this action. Def.'s Memo of Law (Dkt. No. 22–7) at 11–12.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

The requirement that inmates exhaust administrative remedies before filing a lawsuit, however, is not a jurisdictional requirement. *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003). Instead, failure to exhaust is an affirmative defense under the PLRA, and "inmates are not required to specifically plead or demonstrate exhaustion in their complaints." [6] *Jones v. Bock,* 549 U.S. 199, 216 (2007). In the event a defendant establishes that the inmate-plaintiff failed to complete the administrative review process prior to commencing the action, the plaintiff's complaint is subject to dismissal. *See Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). [7]

There are grievance procedures in place and available to any Clinton inmate who desires to complain regarding prison conditions at the facility. Gravelle Decl. (Dkt. No. 22–2) at ¶ 17; Johnson Decl. Exh. B (Dkt. No. 22–5). In this case plaintiff's complaint, which is signed under penalty of perjury, and thus has the same force and effect as an affidavit, [8] alleges that he requested a grievance form from Clinton corrections officers but they refused to provide one to him. Compl. (Dkt. No. 1) at 4, 8. In support of his motion, defendant Gravelle avers that plaintiff did not file a grievance regarding the events giving rise to this action while at Clinton. Gravelle Decl. (Dkt. No. 22–2) at ¶ 17.

 **\*9** Although it is clear from the record that plaintiff failed to avail himself of the administrative remedies available to him, his failure to do so does not warrant dismissal of plaintiff's complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

In this instance, although there is no record evidence to suggest that grievance procedures at Clinton were not fully available to plaintiff while he was at the facility, plaintiff does allege that corrections officers stationed at the facility refused to provide him with a grievance form. Under ordinary circumstances, this could justify a recommendation to the assigned district judge that she hold a hearing to develop plaintiff's allegation regarding special circumstances pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011). However, as is discussed more fully below, because I recommend that defendant's motion be granted based on a finding that no reasonable factfinder could conclude that defendant violated plaintiff's rights, a determination of whether plaintiff should be precluded from bringing this action based on a failure to exhaust administrative remedies is not necessary.

### D. *Plaintiff's Excessive Force Claim*
In support of defendant's motion, defendant Gravelle argues that there is no record evidence to support the allegation that he punched plaintiff, and that the record instead supports a finding that defendant's use of force against plaintiff did not violate his Eighth Amendment rights. Def.'s Memo. of Law (Dkt. No. 22–7) at 8–11.

Plaintiff's excessive force claim is grounded in the Eighth Amendment, which prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society,' or 'involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v.. Chapman,* 452 U.S. 337, 349 (1981)).

**\*10** A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319 (internal quotation marks omitted); *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and

the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright,* 554 F.3d at 268 (internal quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6 (1992) (internal quotation marks omitted), accord, *Blyden,* 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—not "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy,* 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness. *Wilkins,* 559 U.S. at 37; *Hudson,* 503 U.S. at 9.

Additionally, courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) (internal quotation marks omitted); *see also Griffin,* 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (internal quotation marks omitted).

"The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency.'" *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8); *see also Blyden,* 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency'). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter,* 501 U.S. 294, 303 (1991), *accord Hudson,* 503 U.S. at 8; *see also Wright,* 554 F.3d at 268. "But when

prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident.' *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins,* 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson,* 503 U.S. at 7; *Whitley,* 475 U.S. at 321; *Romano,* 998 F.2d at 105.

**\*11** Finally, on a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003)) (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")).

In this case, although plaintiff's complaint alleges that defendant Gravelle punched him twice in the head, there is no record evidence to support his claim. Compl. (Dkt. No. 1) at 8. Instead, the record reveals that defendant used O.C. spray against plaintiff on one occasion during the course of an altercation with corrections officers, while those officers attempted to gain control over him. The video recording submitted in support of defendant's motion shows defendant coming into the changeout room after plaintiff was already on the ground with several officers trying to restrain him. Defendant quickly applied the O.C. spray to plaintiff's face, and then moved away from plaintiff and the other officers. According to defendant, corrections officers initiated the use of force against plaintiff as a result of his failure to obey orders to keep his hands on the wall during the pat-search. Defendant's use of force lasted a matter of seconds, and he sprayed him only to assist corrections officers in restraining him. In addition, although defendant states that plaintiff was seen by medical staff at Clinton

following the incident, nothing in the record, including plaintiff's complaint, indicates that plaintiff suffered a physical injury as a result of the incident. In light of all of this record evidence, I find that no reasonable factfinder could conclude that defendant used force against plaintiff maliciously or sadistically, or for any other purpose than restoring order. *See Kopy v. Howard,* No. 07–CV0417, 2010 WL 3808677, at \*3 (N.D.N.Y. Aug. 11, 2010) (Treece, M.J.), *report and recommendation adopted by* 2010 WL 3807166 (N.D .N.Y. Sept. 21, 2010) (Hurd, J.) (granting summary judgment where the record evidence demonstrated that the defendants used pepper spray on the plaintiff only once after plaintiff was repeatedly ordered to return to his cell and plaintiff suffered no injuries). Accordingly, I recommend that defendant's motion be granted. [9]

## IV. *SUMMARY AND RECOMMENDATION*

In defendant's motion, he challenges the legal sufficiency of plaintiff's excessive force claim. Because the record contains a dispute of material fact as to whether plaintiff's failure to exhaust available administrative remedies may be excused, defendant is not entitled to dismissal on that basis. However, after a careful review of the record evidence, including a video recording of defendant's use of force, I find that no reasonable factfinder could conclude that defendant violated plaintiff's Eighth Amendment rights.

**\*12** Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 22–7) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 86 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5372872

Footnotes

1    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

2    A camera is installed in the changeout room. *Id.* at ¶ 10. In support of his motion, defendant submitted, as Exhibit A to his declaration, a copy of the recording from plaintiff's intake during the pat-search on February 5, 2012. Gravelle Decl. Exh. A (traditionally filed).

3    The term "O.C. spray" is not defined in defendant's motion papers. *See,* e.g., Gravelle Decl. (Dkt. No. 22–2); Def.'s L.R. 7 .1(a)(3) Statement (Dkt. No. 22–6).

4    Copies of all unreported decisions cited have been appended to this report for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

5    Plaintiff's response was due on January 22, 2013. Notice to Plaintiff (Dkt. No. 24). On July 24, 2013, the court received a letter from plaintiff requesting leave to file a response in opposition to the pending motion. Dkt. No. 29. Because plaintiff's request was over six-months late, and he was adequately put on notice previously of the consequences of failing to respond to defendant's motion, and in light of the unfair prejudice that defendant would incur as a result of such a delayed response, I denied that motion. Text Order Dated July 24, 2013.

6    In this case, defendant Gravelle raised failure to exhaust administrative remedies as a defense in his answer to plaintiff's complaint. Dkt. No. 14 at ¶ 14.

7    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted)).

8    18 U.S.C. § 1746; *see also Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes[.]").

9    Because I recommend dismissal of plaintiff's complaint based on the merits, I have not considered defendant's qualified immunity argument.

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by McDonald v. Zerniak, N.D.N.Y., November 4, 2016

2014 WL 5475293
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Charles McALLISTER also known
as Charles McCallister, Plaintiff,
v.
Harold CALL, Vocational Supervisor,
Mohawk Correctional Facility, Defendant.

No. 9:10–CV–610 (FJS/CFH).
|
Signed Oct. 28, 2014.
|
Filed Oct. 29, 2014.

**Attorneys and Law Firms**

Charles McAllister, Westbury, NY, pro se.

Hon. Eric T. Schneiderman, Office of the New York State
Attorney General, The Capitol, Keith J. Starlin, AAG, of
Counsel, Albany, NY, for Defendant.

## ORDER

SCULLIN, Senior District Judge.

**\*1** Currently before the Court are Magistrate Judge
Hummel's October 9, 2014 Report–Recommendation and
Order, *see* Dkt. No. 81, and Plaintiffs objections thereto,
*see* Dkt. No. 83.

Plaintiff, a former inmate who was, at all relevant times, in
the custody of the New York Department of Corrections
and Community Supervision, commenced this action
pursuant to 42 U.S.C. § 1983. In his original complaint,
Plaintiff asserted claims against Brian Fischer, Lucien
J. LeClaire, Patricia LeConey, Carol Woughter, and
John and Jane Does. Defendants moved for summary
judgment. *See* Dkt. No. 49. By Report–Recommendation
and Order dated July 6, 2012, Magistrate Judge Homer
recommended that this Court dismiss all claims against
the named individuals and direct Plaintiff to join Harold
Call as a Defendant. *See* Dkt. No. 55. This Court accepted
the Report and Recommendation and Order in its entirety

and directed Plaintiff to file an amended complaint to
"include only one cause of action a procedural due process
claim in connection with his disciplinary hearing and one
Defendant hearing officer Call ." *See* Dkt. No. 58 at 4–5.

Plaintiff thereafter filed his amended complaint and
requested compensatory and punitive damages. *See* Dkt.
No. 64, Amended Complaint at 4. In this amended
complaint, Plaintiff alleged that Defendant violated
his constitutional rights under the First, Eighth and
Fourteenth Amendments. *See* Dkt. No. 64, Amended
Complaint at ¶¶ 33, 34, 43.

On May 9, 2014, Defendant filed a motion for summary
judgment pursuant to Rule 56 of the Federal Rules
of Civil Procedure. *See* Dkt. No. 74. In a Report–
Recommendation and Order dated October 9, 2014,
Magistrate Judge Hummel recommended that this Court
grant Defendant's motion in part and deny his motion in
part. *See* Dkt. No. 81 at 33. Plaintiff filed objections to
Magistrate Judge Hummel's recommendations. *See* Dkt.
No. 83.

Where a party makes specific objections to portions of a
magistrate judge's report and recommendation, the court
conducts a *de novo* review of those recommendations. *See*
*Trombley v. Oneill,* No. 8:11–CV–0569, 2011 WL 5881781,
*2 (N.D.N.Y. Nov. 23, 2011)* (citing Fed.R.Civ.P. 72(b)
(2); 28 U.S.C. § 636(b)(1)(C)). Where a party makes
no objections or makes only conclusory or general
objections, however, the court reviews the report and
recommendation for "clear error" only. *See* *Salmini v.*
*Astrue,* 3:06–CV–458, 2009 WL 1794741, *1 (N.D.N.Y.
June 23, 2009)* (quotation omitted). After conducting the
appropriate review, a district court may decide to accept,
reject, or modify those recommendations. *See* *Linares*
*v. Mahunik,* No. 9:05–CV–625, 2009 WL 3165660, *10
(N.D.N.Y. Sept. 29, 2009)* (quoting 28 U.S.C. § 636(b)(1)
(C)).

Although Plaintiff's objections are, in most respects,
general or conclusory, given his *pro se* status, the Court
has conducted a *de novo* review of Magistrate Judge
Hummel's Report–Recommendation and Order. Having
completed its review, the Court hereby

**\*2** **ORDERS** that Magistrate Judge Hummel's
October 9, 2014 Report–Recommendation and Order is

**ACCEPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Plaintiff's First Amendment claims, his Eighth Amendment claims, and his challenge to the constitutionality of Directive 4913 are **DISMISSED;** and the Court further

**ORDERS** that, to the extent that Plaintiff has asserted claims against Defendant in his official capacity, those official-capacity claims are **DISMISSED;** and the Court further

**ORDERS** that Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's Fourteenth Amendment due process claims and with respect to Defendant's qualified immunity defense; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Hummel for all further pretrial matters; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## REPORT–RECOMMENDATION AND ORDER [1]

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Charles McAllister ("McAllister"), a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"),[2] brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Harold Call ("Call"), Vocational Supervisor, Mohawk Correctional Facility ("Mohawk"), violated his constitutional rights under the First, Eighth and Fourteenth Amendments. Am. Compl. (Dkt. No. 64) ¶¶ 33, 34; 4. McAllister initially commenced this civil

rights action against defendants Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. Dkt. No. 49. By report and recommendation dated July 6, 2012, (1) all claims against identified defendants were dismissed; and (2) defendant was directed to join Call, who was identified in the motion papers as a John Doe defendant. Dkt. No. 55; Dkt. No. 58. The report and recommendation was accepted in its entirety, and McAllister was directed to file an amended complaint to "include only one cause of action —a procedural due process claim in connection with his disciplinary hearing—and one Defendant—hearing officer Call." Dkt. No. 58 at 4. McAllister thereafter filed his amended complaint wherein he requested punitive and compensatory damages. Am. Compl. at 4. Presently pending is Call's motion for summary judgment on the amended complaint pursuant to Fed.R.Civ.P. 56. Dkt. No. 74. McAllister did not respond. For the following reasons, it is recommended that Call's motion be granted in part and denied in part.

### I. Failure to Respond

The Court notified McAllister of the response deadline and extended the deadline for his opposition papers on two occasions. Dkt. No. 75; Dkt. No. 77; Dkt. No. 80. Call also provided notice of the consequence of failing to respond to the motion for summary judgment in his motion papers. Dkt. No. 74–1. Despite these notices and extensions, McAllister did not respond.

**\*3** Summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Thus, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Id.* at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted); *see also Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (same). The facts set forth in defendant's

Rule 7.1 Statement of Material Facts (Dkt. No. 74–2) are accepted as true as to those facts that are not disputed in McAllister's amended complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.").

## II. Background

The facts are reviewed in the light most favorable to McAllister as the non-moving party. *See* subsection III(A) *infra.* At all relevant times, McAllister was an inmate at Mohawk. Am. Compl. ¶ 3.

On or about July 15, 2009, nonparty Correction Officer Femia, pursuant to authorization from nonparty Captain Dauphin, searched McAllister's personal property while McAllister was confined in a secure housing unit ("SHU").[3] Dkt. No. 74–3, Exh. A, at 14; Am. Compl. ¶¶ 5–6. Femia confiscated approximately twenty documents from McAllister's locker, including five affidavits that were signed by other inmates. Dkt. No. 74–3, Exh. A, at 14. As a result of the search, Femia issued McAllister a Tier III misbehavior report, alleging violations of prison rules 113.15[4] (unauthorized exchange) and 180.17 (unauthorized assistance).[5] *Id.;* Am. Compl. ¶ 7.

McAllister was assigned as his inmate assistant nonparty Correction Officer A. Sullivan. Am. Compl. ¶ 7; Dkt. No. 74–3, Exh. A, at 11. McAllister requested five inmate witnesses, documents, prison directives 4933 and 4982, and a facility rule book. Am. Compl. ¶ 8; Dkt. No. 74–3, Exh. A, at 11. He also asked Sullivan for permission to retrieve documents from his personal property. *Id.* The requested witnesses were those inmates whose signatures were affixed to the five confiscated affidavits. Dkt. No. 74–3, Exh. A, at 14. Sullivan retrieved the requested materials, and all inmate witnesses agreed to testify. *Id.* at 11.

On or about July 21, 2009, a Tier III disciplinary hearing was held before Call, who served as the hearing officer. Am. Compl. ¶ 10. McAllister pleaded not guilty to both alleged violations. Dkt. No. 74–3, Exh. A, at 38. McAllister objected to the misbehavior report as violative of prison directive 4932 because the copy he was given (1) provided insufficient notice of the charges against him and

(2) differed from the report that Call read into the record. *Id.* at 39–41. McAllister stated that his copy did not list the names of the inmates to whom the confiscated affidavits allegedly belonged. *Id.* Call acknowledged the difference between the reports but concluded that the misbehavior report informed McAllister of the charges against him and the bases for the charges. *Id.* at 39, 41–42. McAllister also argued that his copy of the misbehavior report referred to confiscation of twenty documents from his cell, but did not identify the papers that were taken. *Id.* at 42. He contended that the misbehavior report's general reference to "legal work" was insufficient to provide him with notice of the documents to which the report was referring because he had several volumes of legal work. *Id.* at 42, 59. In response to this objection, Call recited the body of the misbehavior report, which described the confiscated documents as "[a]rticles of paper which appear to be legal work including some signed affidavits" and asked McAllister, "[t]hat didn't ring a bell for you? How much paperwork did you have that fit that description?" *Id.* at 42. Call also expressed his belief that the affidavits qualified as legal work. *Id.* at 45, 57–58.

**\*4** McAllister next argued that he did not provide unauthorized legal assistance to another inmate in violation of rule 180.17 because the inmate affidavits were used as evidence to prove that the Division of Parole had a "practice" of "fail[ing] to respond to appeals over the last four years .... " Dkt. No. 74–3, Exh. A at 45–49, 56. These inmates were aware that their affidavits were created for, and to be used solely in support of, McAllister's case and that they were receiving no legal benefit. *Id.* at 48–49. McAllister further contended that he did not need permission from prison personnel to collect the affidavits. *Id.* at 64.

McAllister also argued that rule 113.15 is ambiguous because it does not list the specific items which, if found in an inmate's possession, would violate the rule. Dkt. No. 74–3, Exh. A, at 54. Finally, to the extent it can be determined from the hearing transcript, McAllister objected to the SHU procedures for handling his personal property. *Id.* at 70.

At the conclusion of the hearing, Call informed McAllister that he would be considering testimony from a confidential witness. Dkt. No. 73–3, Exh. A, at 13, 38, 73. McAllister objected to consideration of confidential testimony without being informed of the contents. *Id.* at

74. Finally, McAllister declined to call the inmates that he had requested as witnesses. *Id.* at 37, 71.

Call found McAllister guilty of violating prison rules 113.15 and 180.17. Dkt. No. 74–3, Exh. A, at 8–9, 76. He imposed a penalty of three months in SHU and three months loss of privileges. *Id.* at 8. Call relied upon the misbehavior report, the confidential testimony, the packet of legal work containing the other inmates' affidavits, and McAllister's testimony and statements. *Id.* at 9.

The disciplinary determination was reversed upon administrative appeal on the ground that the evidence failed to support a finding of guilt. Dkt. No. 74–3, Exh. B, at 79; Exh. C, at 81. In May 2010, McAllister commenced this action pursuant to 42 U.S.C. § 1983.

### III. Discussion [6]

McAllister argues that Call violated his rights under (1) the First Amendment, by (a) retaliating against him by finding him guilty and (b) hindering his access to the courts; (2) the Eighth Amendment, by imposing a three-month SHU assignment, plus ten additional days following reversal of the disciplinary hearing; and (3) the Fourteenth Amendment, because (a) he was given insufficient notice of the charges against him, (b) he was denied advance notice of the use of a confidential witness, (c) he was forced to spend approximately fifty-two days in SHU as a result of the misbehavior report, (d) Call failed to follow certain DOCCS directives and prison regulations, (e) Call demonstrated bias against him during the Tier III hearing and prejudged his guilt, and (f) he was denied equal protection.

#### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined

by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

#### B. Eleventh Amendment

Call argues that he is entitled to Eleventh Amendment immunity relating to McAllister's claims for money damages against him in his official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against

one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because McAllister seeks monetary damages against Call for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

**\*6** Accordingly, it is recommended that Call's motion on this ground be granted.

### C. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered personally involved if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [7] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

As to any constitutional claims beyond those surrounding the denial of due process at the Tier III hearing, the undersigned notes that evaluation of such is unnecessary as it is outside of the scope set forth in this Court's prior order. Dkt. No. 58 at 4. However, to the extent that Call acknowledges these claims and provides additional and alternative avenues for dismissal, McAllister fails to sufficiently allege Call's personal involvement in impeding his access to the courts, in violation of the First Amendment. McAllister argues that, as a result of Call's determination that he violated rules 113.15 and 180.17, his legal paperwork was confiscated, which impaired his ability to continue to represent himself in pending state and federal court claims. Am. Compl. ¶¶ 38– 40. However, McAllister does not suggest that Call was personally involved in either the search and confiscation of paperwork that led to the filing of the misbehavior report nor the subsequent reduction in his paperwork pursuant to directive 4913. To the contrary, McAllister concedes that the paperwork was reduced pursuant to the directive.

McAllister also fails to sufficiently allege Call's personal involvement in the SHU procedures for storing property or in holding him in SHU for ten additional days following the reversal of the Tier III determination. Call stated that hr had no involvment with the storage of property in SHU. Dkt. No. 74–3, at 5. Call also contended that he "was not responsible for plaintiff's being held in SHU for

additional days following the August 26, 2009 reversal of the disciplinary hearing decision of July 22, 2009." *Id.* McAllister does not allege Call's involvement in this delay. McAllister's sole reference to the ten-day delay is his claim that he "was not released from Special Housing until September 4, 2009, approximately 10 days after the reversal" Am. Compl. ¶ 43. This conclusory statement is insufficient to demonstrate Call's personal involvement in an extension of his time in SHU following the reversal of the Tier III determination. *Brown,* 647 F.Supp.2d at 200.

**\*7** Accordingly, it is recommended that Call's motion be granted insofar as McAllister alleges that Call: denied him access to the courts in violation of the First Amendment, was at all involved with the storage of his property while he was in SHU, and caused him to be held an additional ten days in SHU following administrative reversal of the Tier III determination.

### D. First Amendment

McAllister appears to argue that, in retaliation for his filing of grievances and lawsuits, Call found him guilty of the misconduct in the Tier III hearing and imposed SHU time. He suggests that his transfer to SHU, as a result of the Tier III determination, triggered enforcement of his compliance with directive 4913, which impeded his ability to proceed with active legal matters and resulted in dismissals. Am. Compl. ¶ 41. Thus, McAllister also argues that he was denied access to the courts. Am. Compl. ¶ 38. As a preliminary matter, McAllister's First Amendment retaliation and access claims are beyond the scope of the prior order of this Court directing McAllister to limit his amended complaint "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing." Dkt. No. 58, at 4. Regardless, McAllister fails to plausibly allege either retaliation or denial of access to the courts.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St.,*

*LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). To survive a motion to dismiss, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Taylor v. Fischer,* 841 F.Supp.2d 734, 737 (W.D.N.Y.2012). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *See Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007).

**\*8** Here, McAllister baldly states that Call's disciplinary determination was imposed in retaliation for his filing of grievances and lawsuits; however, McAllister does not identify these grievances and lawsuits nor does he claim that any of these were lodged against Call. *See generally Ciaprazi v. Goord,* No. 02–CV–915, 2005 WL 3531464, at \*9 (N.D.N.Y. Dec. 22, 2005) (dismissing the plaintiff's claim of retaliation where the plaintiff could "point to no complaints lodged by him against or implicating the conduct of [the] defendant ... who issued the disputed misbehavior report."). McAllister also provides no time frame for the apparent grievance and lawsuits. Thus, it cannot be discerned whether or how these unnamed grievances and lawsuits were a "motivating factor" in Call's Tier III determination. *Doyle,* 429 U.S. at 287 (internal quotation marks and citation omitted). McAllister's unsupported, conclusory claim fails to plausibly demonstrate that Call's determination was a product of retaliatory animus.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. *Bounds v. Smith,* 430 U.S. 817, 824 (1977); *Lewis v. Casey,* 518 U.S. 343, 350 (1996) ("The right that *Bounds* acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or

file them." *Lewis,* 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Second, the plaintiff must demonstrate that he suffered an actual injury. *Id.; Monsky v. Moraghan,* 123 F.3d 243, 247 (2d Cir.1997) (internal citations, quotation marks, and alterations omitted) (quoting *Lewis,* 518 U.S. at 329) ("In order to establish a violation of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, *i.e.,* took or was responsible for actions that hindered a plaintiff's effort to pursue a legal claim"). Thus, a plaintiff must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim." *Davis,* 320 F.3d at 351 (internal quotation marks omitted).

Here, there is insufficient evidence to give rise to a genuine dispute of fact regarding either element of a denial of court access claim. As noted, McAllister merely states that, as a result of the property reduction pursuant to directive 4913, his "ability to continue litigation in Federal and State court caused adverse decisions by the court and dismissals." Am. Compl. ¶ 41. This claim is insufficient to demonstrate that Call was responsible for actions that hindered his legal claims. Insofar as McAllister's claim could be read to suggest that Call denied him access to the courts by confiscating his legal documents, as noted *supra,* McAllister fails to present any plausible facts to support a finding that Call was involved in the initial search of his property or in the later reduction of his property or that it was maliciously imposed by Call. As noted, the initial cell search which led to the misbehavior report was ordered by Captain Dauphin and executed by Correction Officer Femia. Similarly, McAllister concedes that his property was reduced pursuant to directive 4913. Although McAllister suggests that his transfer to SHU as a result of the Tier III hearing triggered the application of directive 4913, he was transferred to SHU on July 9, six days before the initial cell search occurred. *Id.* ¶ 5. Thus, if McAllister were forced to comply with directive 4913 because of his transfer to SHU, he failed to demonstrate that the compliance arose from the SHU term ordered by Call rather than the unknown incident that resulted in his transfer to SHU on July 9. Further, McAllister failed to establish any actual injury because he did not specify which cases were allegedly dismissed as a result of the property reduction. *See Monsky,* 123 F.3d at 247.

**\*9** Accordingly, it is recommended that Call's motion for summary judgment be granted on this ground.

### E. Eighth Amendment

In his amended complaint, McAllister references the Eighth Amendment. Am. Compl. ¶ 31. However, McAllister's only reference to the Eighth Amendment is his assertion that Call's use of a confidential witness violated his Eighth Amendment right to be free from cruel and unusual punishment. However, in support of this argument, McAllister states only that this right was violated when Call stated, "[s]o, um there is a lot of stuff going on through my paperwork and I want to bring it to your attention before we move on ..." *Id.* ¶ 33; Dkt. No. 74–3, at 73. When read in context, it becomes clear that Call made this statement immediately before informing McAllister of his consideration of confidential information. Dkt. No. 73–3, at 73. Although, in referencing this portion of the hearing transcript McAllister alleges that he was subject to cruel and unusual punishment, it appears that McAllister intended to assert that the use of a confidential witness was a due process violation. Even if McAllister had intended to argue that use of a confidential witness violates the prohibition of cruel and unusual punishment, such a claim would necessarily fail because the Eighth Amendment protects an inmate's right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837 (1994). As McAllister makes no claim that he faced conditions of confinement imposing a risk to his health or safety and instead focuses his argument on notice of a confidential witness, giving McAllister due solicitude, his claim regarding the use of a confidential witness will be incorporated as part of the due process analysis below.

### F. Fourteenth Amendment

#### 1. Due Process

Well-settled law provides that inmates retain due process rights in prison disciplinary hearings." *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (citing cases). However, inmates do not enjoy "the full panoply of

rights" accorded to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). For a plaintiff to state a claim that he was denied due process at a disciplinary hearing, the plaintiff "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (per curiam) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). To satisfy the first prong, a plaintiff must demonstrate that the deprivation of which he complains is an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted).

### a. Denial of Liberty Interest

**\*10** In assessing whether an inmate plaintiff was denied procedural due process, the court must first decide whether the plaintiff has a protected liberty interest in freedom from SHU confinement. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). If the plaintiff demonstrates the existence of a protected liberty interest, the court is then to determine whether the deprivation of this interest "occurred without due process of law." *Id.* at 351, citing *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460–61 (1989). Due process generally requires that a state afford an individual "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Although not dispositive, duration of disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000); *Blackshear v. Woodward,* No. 13–CV–1165, 2014 WL 2967752 (N.D.N.Y. July 1, 2014).

McAllister suggests that his confinement in SHU for forty-two to fifty-two days is a sufficient deprivation that requires procedural protections. Freedom from SHU confinement may give rise to due process protections; however, the plaintiff must allege that the deprivation imposed "an atypical and significant hardship." *Sandin,* 515 U.S. at 484; *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001) (concluding that SHU confinement does not give rise to due process protections where inmate failed to demonstrate atypical hardship while confined). Although the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard (*Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999)), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections. *See e.g. Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (holding confinement in SHU exceeding 305 days was atypical); *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999) (concluding confinement for fewer than 101 days in SHU, plus unpleasant but not atypical conditions, insufficient to raise constitutional claim). Although the Second Circuit has generally held that confinement in SHU for 101 or fewer days without additional indicia of atypical conditions generally does not confer a liberty interest (*Smart v. Goord,* 441 F.Supp.2d 631, 641 (2d Cir.2006)), it has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d 60, 65 (2d. Cir.2004) (citing, *inter alia, Ortiz,* 323 F.3d at 195, n. 1).

The undersigned notes that it is unclear what portion of McAllister's relatively brief time in SHU is attributable to the Tier III determination, because it appears that McAllister was already in SHU when the instant disciplinary report was filed. Am. Comp. ¶ 5; Dkt. No. 74–3, Exh. A, at 14. The undersigned also notes that there is no indication that McAllister endured unusual SHU conditions. The only reference McAllister makes to his time in SHU is that, upon his transfer to SHU, several bags of his paperwork were confiscated pursuant to directive 4913. *Id.* ¶ 37. However, review of directive 4913 reveals that the personal and legal property limit set forth in directive 4913 applies to the general prison population and inmates in other forms of segregated confinement. Dkt. No. 49–2, at 5–19. Thus, the fact that McAllister was forced to comply with directive 4913 does not indicate that he was subjected to conditions more severe than the normal SHU conditions or conditions imposed on the general prison population. Dkt. No. 74–3, Exh. A, at 14.

**\*11** Although the record is largely absent of detail of the conditions McAllister faced in SHU, there is also nothing in the record comparing the time McAllister

was assigned and spent in disciplinary confinement with the deprivations endured by other prisoners "in the ordinary course of prison administration," which includes inmates in administrative segregation and the general prison population. *Welch v. Bartlett,* 196 F.3d 389, 394 (2d Cir.1999) (holding that, after *Sandin,* "the relevant comparison concerning duration is between the period of deprivation endured by the plaintiff and periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration, including general population prisoners and those in various forms of administrative and protective custody"). Because "[t]he record does not reveal whether it is typical for inmates not being disciplined to spend similar periods of time in similar circumstances," Call's motion for summary judgment should be denied. *Id.* at 394 (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

Accordingly, it is recommended that defendant's motion for summary judgment on this ground be denied.

### b. Procedural Due Process

Assuming a liberty interest exists, it must be determined whether McAllister was denied due process at his Tier III hearing. Where disciplinary hearings could result in SHU confinement or loss of good time credit, "[i]nmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)); *see also Wolff,* 418 U.S. at 556; *Sira v. Morton,* 380 F.3d 57, 59 (2d Cir.2004).

### i. Notice

McAllister first appears to argue that he was denied procedural due process because the misbehavior report (1) violated unnamed DOCCS rules, regulations, and procedures, and (2) failed to provide him with adequate notice of the charges against him because it did not list the five inmates whose affidavits were confiscated and, thus, impacted his ability to prepare a defense to the charges. Am. Compl. ¶¶ 11–13, 16–17. Although inmates are entitled to advance written notice of the charges, "[t]his

is not to suggest that the Constitution demands notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct ...." *Sira,* 380 F.3d at 72 (2d Cir.2004) (citing *Wolff,* 418 U.S. at 564). "[T]here must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.*

First, to the extent that McAllister's argues that the differing disciplinary reports violated unspecified DOCCS rules, regulations, and procedures (Am.Compl.¶¶ 12–13), this claim must fail. A section 1983 claim is not the "appropriate forum" in which to seek review of a violation of a prison regulation. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulation or state law ... the allegations asserted must constitute violations of constitutional due process standards."). Next, McAllister fails to plausibly allege the existence of a question of fact whether the difference between the misbehavior reports deprived him of the ability to identify relevant evidence so that he could prepare a defense. Although McAllister's copy of the report was missing the names of the inmates whose affidavits were confiscated, it informed McAllister of the date, time, and location of the alleged violations; the rules alleged to have been violated; and a description of the documents that were confiscated. *Johnson v. Goord,* 305 Fed. Appx. 815, 817 (2d Cir.2009) (concluding where the inmate's copy of misbehavior report included details of alleged violation and charges against him, a sentence missing from the inmate's copy of report did not violate the inmate's due process rights). It is clear that the discrepancy between the misbehavior reports did not affect McAllister's ability to prepare and present a defense. Prior to the hearing, McAllister requested as witnesses the five inmates whose affidavits were found during the property search. Indeed, the record demonstrates that McAllister was able to both identify the documents referenced in the misbehavior report and address them at the hearing. Dkt. No. 74–3, Exh. A at 45, 47–48.

**\*12** Thus, because he received sufficient notice of the charges against him and was able to prepare and present a defense on his behalf, McAllister fails to raise a question of fact as to whether he was denied sufficient notice of the charges against him.

ii. **Hearing Officer Bias/Pre-determination of Guilt**

McAllister also contends that his procedural due process rights were violated because Call was biased against him and prejudged his guilt. The Fourteenth Amendment guarantees inmates the right to the appointment of an unbiased hearing officer to address a disciplinary charge. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). An impartial hearing officer "does not prejudge the evidence" and is not to say "how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard"). However, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Nelson v. Plumley,* No. 9:12–CV–422, 2014 WL 4659327, at *11 (N.D.N.Y. Sept. 17, 2014) (quoting *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at * 5 (W.D.N.Y. Oct. 5, 2010) (quoting *Waldpole v. Hill,* 472 U.S. 445, 455 (1985)). However, "the mere existence of 'some evidence' in the record to support a disciplinary determination does not resolve a prisoner's claim that he was denied due process by the presence of a biased hearing officer." *See Smith v. United States,* No. 09–CV–729, 2012 WL 4491538 at *8 (N.D.N.Y. July 5, 2012).

Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." *Allen,* 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington v. Afify,* 968 F.Supp.2d 532, 541 (W.D.N.Y.2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez,* No. 09–CV–626 (FJS/ATB), 2011 WL 7629513, at *11 (N.D.N.Y. Mar. 1, 2011) (citing *Francis,* 891 F.2d at 46).

McAllister first argues that Call prejudged his guilt. He supports this contention by pointing to moments during the Tier III hearing where Call expressed his belief that McAllister's possession of affidavits signed by other

inmates was sufficient to support a violation of prison rules 113.15 and 180.17. Am. Compl., ¶¶ 13, 15, 23–25, 36. Here, however the challenged affidavits were not evidence that Call prejudged because he had the opportunity to review the affidavits and did so at the hearing. Although McAllister disagreed with Call's opinion that possession of such documents would be a *per se* violation of the rules, Call's assertion of belief in this matter was an opinion he reached following his personal review of this evidence. *See Johnson v. Doling,* No. 05–CV–376, 2007 WL 3046701, at * 10 (N.D.N.Y. Oct. 17, 2007) (holding that where the "[p]laintiff was provided the opportunity to testify, [and] call and question witnesses .... [d]isagreement with rulings made by a hearing officer does not constitute bias"). Thus, it does not appear that Call prejudged this evidence.

**\*13** To support his claim that Call exhibited bias and partiality against him in the Tier III hearing, McAllister points out that, after he objected to the misbehavior report for failing to provide him sufficient notice of the documents confiscated, Call read the portion of the misbehavior report describing the documents as "[a]rticles of paper which appear to be legal work including some signed affidavits," and stated "that didn't ring a bell for you?" *Id.* ¶¶ 19, 32). When read in context, this statement does not establish bias on Call's part, rather it appears to be a genuine question. Though it may be said that Call could have couched this question in a kinder manner, this statement does not demonstrate bias. Moreover, that the Tier III determination was reversed on appeal, without more, is not evidence of bias or other due process violation. *Eng v. Therrien,* No. 04–CV–1146, 2008 WL 141794, at *2 (N.D.N.Y. Jan. 11, 2008).

Thus, McAllister fails to plausibly allege the existence of question of fact whether Call prejudged his guilt or was otherwise biased in the Tier III hearing.

iii. **Failure to Investigate**

McAllister next suggests that he was denied procedural due process because Call declined to interview the law library officer. Am. Compl. ¶ 29. Call permitted McAllister to present testimony on his behalf and afforded him the opportunity call witnesses. Had McAllister wished to hear testimony from the law library officer, he could have requested the law library officer as a witness. *Wolff,* 418 U.S. at 566 (inmates have a right to call

witnesses in their defense at disciplinary hearings). That Call found it unnecessary to independently interview the law library officer—especially where McAllister did not demonstrate that his testimony would be relevant —does not result in a denial of due process because "[t]here is no requirement ... that a hearing officer assigned to preside over a disciplinary hearing conduct an independent investigation; that is simply not the role of a hearing officer." *Robinson v. Brown,* No. 9:11–CV–0758, 2012 WL 6799725, *5 (N.D.N.Y. Nov. 1, 2012).

Accordingly, McAllister fails plausibly raise a due process violation based on Call's alleged failure to investigate.

#### iv. **Confidential Witness**

To the extent it can be discerned, McAllister contends that he was denied due process because Call relied on confidential witness testimony, yet failed to provide him with advance notice of the confidential witness and refused to inform him of his or her identity or the nature of the testimony. Am. Compl. ¶¶ 30–34. The Second Circuit has held that a hearing officer must perform an independent assessment of a confidential informant's credibility for such testimony to be considered reliable evidence of an inmate's guilt. *Sira,* 380 F.3d at 78 (noting that, "when sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened.").

**\*14** Here, the record provides no indication that Call independently assessed the credibility and reliability of the confidential witness. The confidential witness form merely states that Call "was provided confidential information relating to the misbehavior report ." Dkt. No. 74–3, at 13. Similarly, Call does not provide whether or how he performed an assessment of the witness's credibility. *Id.* at 4. Therefore, there exist questions of fact whether Call deprived McAllister of due process by relying on this testimony without an independent assessment of the witness's credibility.

To the extent that McAllister argues that he was denied due process by Call's decision to refuse to disclose the content of the confidential witness's testimony, the law in this circuit provides that where a prison official decides to keep certain witness testimony confidential, he or she "must offer a reasonable justification for their actions, if not contemporaneously, then when challenged in a court action." *Sira,* 380 F.3d at 75 (citing *Ponte v. Real,* 471 U.S. 491, 498 (1985)). Although "[c]ourts will not readily second guess the judgment of prison officials with respect to such matters ... the discretion to withhold evidence is not unreviewable...." *Id.* (citations omitted). Here, Call failed to provide his rationale for refraining to share the substance of this testimony, stating merely that McAllister could not be told the substance of the testimony because "it is by definition it is ... confidential." Dkt. No. 74–3, at 74. As Call presented no reason to justify withholding the identity or substance of the confidential witness's testimony, McAllister presents a viable due process claim based on the nondisclosure of this evidence. *Sira,* 380 F.3d at 76.

Accordingly, Call's motion for summary judgment should be denied on this ground.

#### v. **Some Evidence**

"Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence which supports the decision of the [hearing officer]." *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) (citations omitted). In considering whether a disciplinary determination is supported by some evidence of guilt, "the relevant question is whether there is any evidence in the record [before the disciplinary board] that could support the conclusion reached by the disciplinary board." *Superintendent v. Hill,* 472 U.S. 445, 455–56 (1985) (citations omitted); *Sira,* 380 F.3d at 69. The Second Circuit has interpreted the "some evidence" standard to require "reliable evidence" of guilt. *Luna,* 356 F.3d at 488.

In making his determination, Call relied upon McAllister's testimony and statements, testimony of a confidential witness, the misbehavior report, and the legal documents confiscated during the property search. Dkt. No. 74–3, at 4. As noted, based on the record provided, Call did not perform an independent assessment of the witness's credibility. Thus, Call's reliance on confidential testimony would be insufficient to support a finding of guilt. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (determining that reliance on confidential informant's testimony

insufficient to provide "some evidence" of guilt where there was no independent examination of indicia relevant to informant's credibility). The remaining evidence relied upon—McAllister's testimony, the misbehavior report, and the affidavits—does not constitute some evidence of guilt, as required by the Due Process clause.

**\*15** The affidavits alone do not constitute some evidence of guilt because mere possession of affidavits signed by other inmates would not violate prison rules 113.15 and 180.17 were it true that these documents were McAllister's property and drafted solely for his benefit. Similarly, although a written misbehavior report may serve as some evidence of guilt, such is the case where the misbehavior report charges the plaintiff for behavior that the author of the misbehavior report personally witnessed. *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214 (W.D.N.Y.2010) (citations omitted) (misbehavior report drafted by officer who personally observed plaintiff possess and transfer pieces of sharpened metal to another inmate constituted some evidence of guilt). In this case, where a determination of guilt would appear to turn on knowledge of the ownership of the documents and an understanding of the circumstances under which the papers were drafted, a misbehavior report which merely states that papers appearing to be legal work signed by other inmates were found in McAllister's property, it does not establish a per se violation of rules 113.15 and 180.17. *See Hayes v. Coughlin,* No. 87 CIV. 7401, 1996 WL 453071, at \*3 (S.D.N.Y. Aug. 12, 1996) ("if a misbehavior report can serve as 'some evidence' for a hearing decision and thereby insulate a hearing from review, there would be little point in having a hearing"); *see also Williams v. Dubray,* No. 09–CV–1298, 2011 WL 3236681, at \*4 (N.D.N.Y. July 13, 2011) (holding that there were questions of fact whether the determination was based upon some evidence of guilt where the hearing officer relied on misbehavior report that was based on a corrections officer's unsupported accounts, without additional evidence to support its charges). Thus, absent additional evidence that these papers belonged to other inmates or that McAllister drafted the documents for other inmates' use, the fact that the misbehavior report identified these documents as being found in McAllister's secured property does not constitute reliable evidence of guilt.

Finally, McAllister's testimony does not constitute reliable evidence of guilt. In response to the charge of violating rule 113.15, McAllister testified that the affidavits were

his property because he drafted them solely as evidence in his personal litigation against the Department of Probation. Similarly, in defense of the charge for violating rule 180.17, McAllister repeatedly testified that he did not provide legal assistance to the inmates in question because the affidavits were written solely to serve as supporting evidence in his personal action, the inmates were aware that they would receive no legal benefit as a result, and he did not receive any compensation from the inmates. Regardless whether Call considered McAllister's testimony to be credible, without some other reliable evidence, such as, perhaps, a statement from one of the other inmates claiming that he signed the affidavit under the belief that McAllister would provide him with legal assistance, McAllister's testimony denying violations of the charged prison rules would not constitute some evidence of guilt.

**\*16** Accordingly, it is recommended that Call's motion for summary judgment be denied as to McAllister's procedural due process claim.

### c. **Directive 4913**

McAllister further argues that, as a result of the SHU placement, he suffered an unconstitutional deprivation of his legal and personal property because he was required to comply with the limits set forth in directive 4913. This Court has already ruled upon this claim when it was raised at earlier stages. In deciding Call's motion for summary judgment on the McAllister's first complaint, this Court held that the directive did not violate his Fourteenth Amendment rights:

> Directive # 4913 was reasonably related to valid institutional goals given DOCCS' responsibility to provide for the health and safety of its staff and inmates and the alternatives provided to inmates in being able to seek exceptions and choose which four or five draft bags of material would remain with them. Moreover, the rules were neutral and reasonably related to the ultimate goals of the facility, security and safety.

*McAllister v. Fischer,* 2012 WL 7681635, at *12 (N.D.N.Y. July 6, 2012) (Dkt. No. 55, at 22–23), *Report and Recommendation adopted by* 2013 WL 954961 (N.D.N.Y. Mar. 12, 2013) (Dkt. No. 58), *appeal dismissed* 2d Cir. 13–111 (Jan. 13.2014). Further, the Court concluded that directive 4913 "did not violate[ ] McAllister's Fourteenth Amendment rights" and was "reasonably related to valid institutional goals." Dkt. No. 55, at 23–24; Dkt. No. 58. Thus, any such claim is barred by the law of the case. *Arizona v. California,* 460 U.S. 605, 618 (1983) (citations omitted); *see also United States v. Thorn,* 446 F.3d 378, 383 (2d Cir.2006) (internal quotation marks and citations omitted) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent cogent and compelling reasons ....")); *Arizona,* 460 U.S. at 618 (citations omitted); *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987) (citations omitted) ("Even when cases are reassigned to a different judge, the law of the case dictates a general practice of refusing to reopen what has been decided.").

Accordingly, it is recommended that defendant's motion for summary judgment be granted on this ground.

## 2. Equal Protection

McAllister's only reference to an equal protection violation in the amended complaint is his conclusory claim that Call's reference to a confidential witness during the Tier III hearing was in violation of his right to equal protection. Am. Compl. ¶ 31. Further, in this Court's previous order, McAllister's equal protection claim was dismissed for failure to demonstrate, among other things, that he was part of a protected class or that he was treated differently from any similarly-situated inmates. Dkt. No. 58, at 4; Dkt. No. 55, at 24–25. Thus, any such claim would also be barred by the law of the case. *Thorn,* 446 F.3d at 383. Regardless, McAllister's equal protection claim must also fail for the reasons discussed *infra.*

**\*17** To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). McAllister has not identified, nor does the record disclose, any basis for a reasonable fact-finder to conclude that he was treated differently from similarly-

situated individuals. Rather, plaintiffs only support for his equal protection claim is the following:

> Call, throughout the entire disciplinary hearing deprive [sic] plaintiff equal protection when he stated: "This is hearing officer Call, this is 2:21 as I was going through my paperwork I realized something that I wanted to point out to Mr. McAllister."

> Defendant Call discriminated against plaintiff when he stated: "I reviewed it this morning the 22nd when it was received again is confidential"

Am. Compl. ¶¶ 31–32. McAllister does not explain how these statements denied him equal protection. McAllister fails to plausibly suggest that he was treated differently from any similarly-situated individuals. Further, even if these statements demonstrate the existence of questions of fact regarding whether McAllister was treated differently from similarly-situated persons, he fails to identify disparity in the conditions "as a result of any purposeful discrimination directed at an identifiable suspect class." *See Dolberry v. Jakob,* No. 11–CV–1018, 2014 WL 1292225, at *12 (N.D.N.Y. Mar. 28, 2014).

Accordingly, it is recommended that defendant's motion on this ground should be granted.

## G. **Qualified Immunity**

Call contends that, even if McAllister's claims are substantiated, he is entitled to qualified immunity. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna,* 356 F.3d at 490 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)) (internal quotation marks omitted). This assessment is made "in light of the legal rules that were clearly established at the time it was taken." *Wilson,* 526 U.S. at 614; *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to

determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Phillips v. Wright,* 553 Fed. Appx. 16, 17 (2d Cir.2014) (citing *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013)).

**\*18** First, as discussed, McAllister presented a viable due process claim that the determination was not based on some evidence of guilt because Call (1) relied on confidential witness testimony without making an independent assessment of the witness's credibility and (2) did not otherwise have sufficient reliable evidence to support his finding of guilt. McAllister has also raised issues of fact whether the remaining evidence relied upon —the misbehavior report, McAllister's testimony and statements, and the confiscated legal papers—provided reliable evidence of guilt.

Addressing the second prong of the analysis, there is a clearly-established right to procedural due process protections, including the right to have a disciplinary determination be based on some evidence of guilt. There is also a clearly-established right to an independent assessment of confidential witnesses performed where a hearing officer relies on the witness's testimony (*Vasquez v. Coughlin,* 726 F.Supp. 466, 472 (S.D.N.Y.1989) (right clearly established by 1986); see also *Sira,* 380 F.3d at 80). Further, although there is no bright-line for what suffices as "some evidence" in every prison disciplinary proceeding (*Woodard v. Shanley,* 505 Fed. Appdx. 55, 57 (2d Cir.2012)), there were questions of fact surrounding the allegedly reliable evidence demonstrating that McAllister was in possession of other inmates' legal documents or that he provided them with unauthorized legal assistance. *Cf. Turner v. Silver,* 104 F.3d 354, at \*3 (2d Cir.1996) (some evidence to support determination that the defendant violated rule against unauthorized legal assistance where documentary evidence indicated the plaintiff received payment from other inmates, author of misbehavior report testified regarding an interview with informant who implicated plaintiff, prison official testified that inmate told her he had been charged for law library services and inmate testified the same). Call both failed to perform an independent assessment of the confidential witness's credibility and provided no explanation for why both the identity of the witness and the substance of his or her

testimony could not be disclosed to McAllister. *Sira,* 380 F.3d at 75 (citing *Ponte,* 471 U.S. at 498).

Thus, given the state of the law regarding the rights to which an inmate is entitled in his disciplinary hearing, it was not objectively reasonable for Call to have believed that (1) he need not perform an independent assessment of the witness credibility or (2) the misbehavior report, confiscated affidavits, and McAllister's consistent testimony and statements, without more, sufficiently supported a determination that McAllister violated rules 113.15 and 180.17.

Accordingly, defendant's motion for summary judgment should be denied on this ground.

## IV. **Conclusion**

For the reasons stated above, it is hereby **RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 74) be

**\*19** 1. **GRANTED** insofar as:

   a. dismissing plaintiff's First Amendment claims;

   b. dismissing plaintiff's Eighth Amendment claims;

   c. dismissing plaintiff's challenge to the constitutionality of Directive 4913;

   d. defendant's Eleventh Amendment immunity defense;

2. **DENIED** as to:

   a. plaintiff's Fourteenth Amendment procedural due process claims;

   b. defendant's qualified immunity defense.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d

Cir.1993); *Small v. Sec'v of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: October 9, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5475293

Footnotes

1 This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2 McAllister is no longer incarcerated and is currently under the supervision of DOCCS.

3 SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b) (1999). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

4 Rule 113.15 provides that "[a]n inmate shall not purchase, sell, loan, give or exchange a personally owned article without authorization." 7 NYCRR 270.2.

5 Rule 180.17 provides that "[a]n inmate may not provide legal assistance to another inmate without prior approval of the superintendent or designee. An inmate shall not receive any form of compensation for providing legal assistance." 7 NYCRR 270.2.

6 All unpublished decisions referenced herein are appended to this report and recommendation.

7 Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N .Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).